[No. B234962. Second Dist., Div. Five. Aug. 23, 2012.]

HOWARD ENTERTAINMENT, INC., et al., Plaintiffs and Appellants, v. LISA KUDROW et al., Defendants and Respondents.

## COUNSEL

Horvitz & Levy, Frederic D. Cohen, Lisa Perrochet; Richard L. Hasen; Berman, Berman & Berman and Stephanie Berman Schneider for Plaintiffs and Appellants.

Sauer & Wagner, Gerald L. Sauer, Eve H. Wagner and Christopher V. Bulone for Defendants and Respondents.

OPINION

MOSK, J.—

## INTRODUCTION

Plaintiff and appellant Scott Howard (Howard), a personal manager, entered into an oral agreement with defendant and respondent Lisa Kudrow (Kudrow), an entertainer, by which agreement he would receive for personal management services a percentage of Kudrow's income.[1] After Kudrow terminated Howard's services, he claimed that he should continue to receive a percentage of Kudrow's income from Kudrow's engagements entered into, or from services rendered, during the period of his retention. Howard relied upon custom and usage in the industry to support his claim. In granting a summary judgment in favor of Kudrow, the trial court excluded from evidence the declaration of Howard's expert on the ground of lack of foundation. We reverse the summary judgment, holding that the expert's declaration should have been admitted in evidence.

## BACKGROUND

### A. The Previous Appeal[2]

Kudrow began working in the entertainment industry in 1986. By 1991, she had performed in a play and in an NBC pilot, made several television appearances, performed minor roles in several motion pictures, and been a featured comedy theater performer. She had a personal manager for approximately one year and also had a talent agent, and knew their different roles. She knew that agents were entitled to commissions on the income generated on contracts they negotiated for their clients and engagements their clients performed during their relationship, even if that income was received- or earned after the termination of the relationship. Kudrow sought career advice from fellow actors and had consulted with an entertainment attorney on issues relating to her entertainment career.

From 1984 through 1989, Howard worked in the entertainment industry, including positions at Capitol Records, MGM, and The William Morris

---

[1] Howard created plaintiff and appellant Howard Entertainment, Inc. (HEI) a few years after he began to perform under his agreement with Kudrow. HEI received monies for Howard's services. About the same time that Howard created HEI, Kudrow formed defendant and respondent Big Fouche Productions, Inc. (BFP), and thereafter BFP made payments for Howard's personal manager services. Neither we nor the parties distinguish between Howard and HEI, or Kudrow and BFP, in connection with the substantive issues.

[2] The facts concerning the previous appeal in this case are based in large part on the facts set forth in our earlier unpublished opinion in that appeal.

Agency (William Morris). During that time he became a talent agent. In 1989, Howard left William Morris.

In 1991, Howard partnered with Debbie Miller, his former supervisor at William Morris, and became a personal manager,[3] an occupation that purportedly was then developing in the entertainment industry.[4] At that time, Howard did not have any experience as a personal manager and did not have any clients.

In 1991, Howard approached Kudrow about becoming her personal manager. Howard and Kudrow orally agreed that Howard would provide personal management services for Kudrow and in return receive a 10 percent commission on her income. There were no other specific discussions about compensation. Kudrow was one of the first clients Howard obtained after he became a personal manager.

In 1992, Kudrow landed a guest-starring part on the popular television show *Mad About You.* In 1993, she was cast in the recurring role of Ursula Buffay on *Mad About You,* and in 1994, she was cast in her "career-making" or "break-out" role as Phoebe on the hit television series, *Friends.* From 1994 through 2004, new episodes of *Friends* were broadcast on prime-time national television. Kudrow became contractually entitled to not only an amount of up to $1 million per episode of *Friends* but also to 1.25 percent of the "backend" earnings—i.e., profits from the show—and she was entitled to certain other residual payments. In 2000, the parties modified their oral agreement to provide that Howard's entitlement to commissions on certain earnings from *Friends* would be reduced. In 2004, the 10th and last year of *Friends,* Kudrow and Howard modified their oral agreement for the second and last time, decreasing Howard's commission from 10 percent to 5 percent

---

[3] "Managers coordinate everything else [(other than procuring roles—the function of a talent agent)]; they counsel and advise, take care of business arrangements, and chart the course of an artist's career." (*Marathon Entertainment, Inc. v. Blasi* (2008) 42 Cal.4th 974, 980 [70 Cal.Rptr.3d 727, 174 P.3d 741]; see *Park v. Deftones* (1999) 71 Cal.App.4th 1465, 1469–1470 [84 Cal.Rptr.2d 616] ["Personal managers primarily advise, counsel, direct, and coordinate the development of the artist's career. They advise in both business and personal matters, frequently lend money to young artists, and serve as spokespersons for the artists."].)

[4] Personal managers had existed for many years before 1991. (See *Marathon Entertainment, Inc. v. Blasi, supra,* 42 Cal.4th at pp. 984, 986, fn. 4, 987, fn. 5, 989.) The following appeared in a 1979 article: "For over twenty-five years, the personal manager operating in the California entertainment industry has been in the throes of a controversy, the specific issues of the dispute being whether and when personal managers need a California license to procure employment for professional entertainers." (Johnson & Lang, *The Personal Manager in the California Entertainment Industry* (1979) 52 So.Cal. L.Rev. 375.) The authors of that article added, "The advent of rock and roll in the mid-1950's dramatically altered the record industry and precipitated the rise of the personal manager." (*Id.* at p. 379, fn. omitted.)

on Kudrow's earnings for the final season of *Friends*.[5] She was earning $1 million per episode for the final 18 episodes of *Friends*.

Kudrow terminated Howard's management services as of early March 2007. During their meeting concerning this termination, neither Kudrow nor Howard addressed Howard's compensation or how the termination would affect his compensation following termination. Thereafter, Howard made a demand for commissions on income Kudrow earned following the termination of their relationship for work she performed during the relationship, such as, for example, in *Friends*. When Kudrow rejected that demand, Howard filed a complaint against her alleging breach of contract and seeking declaratory relief and an accounting. Howard alleged that in 1991, the parties entered into an oral agreement pursuant to which he would provide management services to Kudrow in exchange for a 10 percent commission on her earnings, and that they later modified the agreement. He further alleged that after Kudrow terminated Howard's services, she breached their oral contract by failing to make commission payments for income she received after the termination of his services for work she performed or contracted to perform when Howard was still her manager. Howard sought a declaration of his claimed rights and an accounting of the relevant income.

Kudrow filed a motion for summary judgment contending that although there was an oral agreement pursuant to which Howard would receive commissions on Kudrow's earnings, Howard could not establish that she had breached the agreement because there was no evidence that the parties had agreed to posttermination compensation. Kudrow further contended that the causes of action for declaratory relief and an accounting also failed because they could not survive dismissal of the breach of contract claim.

Howard opposed the motion and submitted a declaration from his expert, Martin Bauer, in which Bauer stated that from at least the early 1980's, it had been the custom and practice in the entertainment industry for personal managers to be paid posttermination commissions on the services that their clients rendered, and on engagements that their clients entered into, when the personal managers were representing them. Bauer opined that Howard, even after Kudrow terminated Howard's services in 2007 was entitled to receive his commissions on all of Kudrow's earnings derived from the services she rendered, and engagements she entered into, while Howard was her manager.

Six calendar days before the summary judgment hearing, Kudrow filed objections to statements set forth in the Bauer declaration on the grounds that

---

[5] The terms of these modifications to the oral agreement are not set forth by the parties with precision in the filings.

such statements were mere conclusions and made without a reasoned explanation connecting them to the facts of the case. At the hearing, after the trial court indicated an intention to sustain the objections to the Bauer declaration and grant the summary judgment motion, the parties argued whether the Bauer declaration contained a sufficient foundation.

Before the trial court ruled on Kudrow's objections, Howard requested a continuance to submit a revised declaration to provide the information the trial court said was missing from the Bauer declaration. The trial court denied Howard's request for a continuance, stating that a continuance was not authorized under Code of Civil Procedure section 437c and that it could not "think of any reason why it would be in [its] discretion to do so." The trial court further noted that Howard had not requested the continuance until after Kudrow objected in her reply papers that the Bauer declaration lacked foundation and Howard learned of the trial court's adverse tentative ruling. The trial court then sustained Kudrow's evidentiary objections and granted the summary judgment motion. In doing so, the trial court observed that had it "admitted the Bower [*sic*] declaration, there would have been a big fat material dispute at several different levels." Thereafter, Howard moved for a new trial and filed a supplemental declaration from Bauer. Howard also moved for relief from default under Code of Civil Procedure section 473 and requested that the trial court reconsider the summary judgment. The trial court denied both motions.

Howard filed a notice of appeal from the summary judgment in favor of Kudrow and the order denying his motion for relief under Code of Civil Procedure section 473. We held that the trial court did not err by sustaining Kudrow's objections to Bauer's declaration, but did err in denying Howard's request for a continuance because the court either failed to exercise its discretion in making that ruling, or at a minimum, it was unclear that the trial court exercised its discretion, which in itself was a basis to remand the matter. Accordingly, we remanded the matter to the trial court with directions to exercise its discretion to determine if Howard was entitled to a continuance to file a supplemental expert declaration.

## B. *Proceedings upon Remand*

After the matter was remanded, the trial court exercised its discretion and granted Howard's request to file a supplemental expert witness declaration. Thereafter, Howard filed an additional Bauer declaration in which Bauer reiterated matters contained in his original declaration, including that from 1974 through 1998, Bauer had experience in the entertainment industry based on his employment by talent agencies as a business affairs executive, vice-president and president, and based on his ownership of various talent

agencies. Bauer stated that during that period he had obtained employment for actors, directors, writers, and producers in the entertainment industry. He added that in 1998 he formed a company, which since that date, has been in the "talent management business, not the agency business."

Bauer, in his additional declaration, also stated, as he did in his original declaration, "I am knowledgeable about the entertainment industry's customs and practices for several reasons. First, my work and personal experiences as a business affairs executive, personal manager and agent have made me familiar with the entertainment industry and how it functions. Second, since 1974 I have dealt with actors, actresses, producers and directors as well as the personal managers, agents, and lawyers who represent them. Third, I have discussed extensively entertainment issues with those in the entertainment industry. Therefore, based on my extensive experience in the entertainment industry, I am familiar with its customs and practices, including how personal managers are compensated for their services. [¶] With respect to personal or talent managers[6] compensation, the custom and practice in the entertainment industry is that managers are paid their commissions on the services that their clients render or engagements that their clients enter into while the personal manager is representing them, no matter when the income from such services or engagements is received by the client.[7] In other words, according to custom and practice, even if a personal manager is terminated by a client, the client continues to pay that personal manager that personal manager's commission on the compensation received on engagements entered into or services rendered while the personal manager was rendering services to that client."

The additional Bauer declaration supplemented the original Bauer declaration by including the following: "[Post-termination compensation] has been the custom and practice in the entertainment industry since at least the early 1980's to the present with respect to agents, and has similarly been the custom and practice since at least 1991 to the present with respect to the analogous relationships between talent such as actors and personal managers. . . . I note that Kudrow testified at her deposition that she was aware of this well known practice concerning the compensation of agents when the agent was terminated since she first started working in the entertainment industry. The practice with respect to the payment of managers when they are terminated is essentially the same practice with respect to agents except that the practice with respect to personal managers has not been set forth in various guild agreements. [¶] . . . [¶] As talent agencies increased in size in the 1990's and thereafter, agents could no longer give their clients the

---

[6] Bauer stated that the designations "talent manager" and "personal manager" are interchangeable.

[7] Bauer stated that the custom and practice existed in 1991.

personal attention that they had in the past . . . . Therefore, it became the role of the talent manager to interface between the client and the talent agencies . . . ." "[B]ecause of certain similarities between managers and agents, customs and practices had arisen in the context of agency relationships were followed with respect to personal manager relationships, including the custom that commissions would be paid on the services that the clients render or engagements that the clients enter into while the agent is representing them, no matter when the income from such services or engagements is received by the client. [¶] . . . [I]n 1991, when Kudrow retained Howard as her talent manager, only a small number of actors and actresses had talent mangers, but customs and practices regarding compensation for such managers nonetheless existed. [¶] . . . [¶] The custom and practice [concerning the post-termination compensation of talent managers] . . . has been widely know [*sic*] and of general and universal application within the entertainment industry. . . . In fact, I cannot recall anyone in the entertainment industry ever challenging that this is not the custom and practice. And this has been the custom and practice since even before 1991, and continues to be the custom and practice today."

Bauer also added, "In approximately March 1991, I became President of UTA, a talent agency, and remained in that position for approximately seven years until I left to become a personal manager, a position which I have continued in until today. While at UTA, I represented actors who were represented by personal managers who were compensated by being paid a percentage of the actor's income. Some of those actors included Jim Carrey, Mike Myers and Alan Alda. While at UTA from 1991–1998, when a manager was fired by the client (which by way of example happened with Mike Myers), the manager continued to receive commission on the income generated from contracts entered into or services performed while the manager was representing the client. Those actors who had personal managers in the early 1990's customarily had the obligation to pay post-termination compensation to their managers similar to the obligations to pay post-termination that talent such as actors and actresses had with their agents. [¶] While an agent and personal manager, I have also had discussions with approximately seven to ten entertainment lawyers including lawyers at the prominent entertainment law firm now known as Ziffren Brittenham who have all confirmed that post-termination compensation for personal managers for contracts entered into or services performed while the manager represented his client is the practice and has been the practice since at least 1991. . . . As I have explained below, my personal experience after I became a personal manager in 1998 is consistent with this practice as well. . . . [¶] . . . Until the last year, all of my personal management clients have had oral agreements with me. . . . The oral agreements provide that I will be paid 10% commission for my services as a personal manager. My oral agreements with my clients were similar to the

agreement between Howard and Kudrow in that they did not expressly deal with post-termination compensation. When my clients have terminated my services, to the extent those clients received monies on contracts that were entered into or services that were rendered while those clients were my client, I regularly received my 10% commission on the monies received by the clients after they terminated me. In fact, I have received letters from entertainment lawyers, including from prominent entertainment law firms, for such clients confirming I will be paid my commission on those engagements entered into or performed while I was the personal manager irrespective of when the client received payments for those engagements, even if years later. Moreover, when I was an agent representing clients who terminated their managers, the client's attorney would usually confirm to the manager that the manager would receive his commission on monies the client received from contracts entered into or for services rendered while the manager was rendering services to the client."

Kudrow filed a supplemental reply and evidentiary objections to the additional Bauer declaration based, inter alia, on the ground that substantial portions of it lacked foundation. The trial court issued a tentative ruling that denied Kudrow's motion for summary judgment and overruled each of her objections to the additional Bauer declaration.

After oral argument at the hearing on Kudrow's motion for summary judgment, the trial court took the matter under submission and then issued a minute order granting Kudrow's motion, stating as follows: "After hearing oral arguments of counsel, the court has reconsidered its tentative ruling and finds that Bauer's [additional] declaration continues to suffer from the same deficiencies as the original declaration. Specifically, although Bauer has been involved in the entertainment industry since 1974, he has only been involved in talent management since 1998, which is after Kudrow and Howard formed the agreement in 1991. Bauer's declaration does not contradict [Kudrow's] evidence that the talent management industry was a new development when Kudrow hired Howard as her manager. Rather, Bauer's declaration confirms that actors began to use talent managers in the 1990's when the talent agencies were growing in size and could no longer give personal attention to their clients. . . . Bauer also acknowledges that in 1991 'only a small number of actors and actresses had talent managers.' . . . Other than Mr. Bauer's conclusory statements, there are no facts to support his opinion that a talent manager's receipt of post-termination compensation was 'widely known and generally applied' within the entertainment industry in 1991 when Kudrow and Howard entered into the oral agreement. The court, therefore, concludes that the declaration does not provide a reasonable basis for Bauer's opinion because it did not contain facts to establish that at the relevant times (1991), the nature and extent of Bauer's experience such that Bauer has knowledge of that specific custom and practice relevant to this case. Evid. Code, section

801(a); *Alvarez v. State of California* (1999) 79 Cal.App.4th 720, 725–726, 728–731 [95 Cal.Rptr.2d 719]. Thus, since Bauer's declaration is not competent evidence, [Howard] do[es] not show that there is any triable issue of material fact. Accordingly, the motion for summary judgment is GRANTED." On April 18, 2011, the trial court issued a nunc pro tunc order stating that all of Kudrow's objections to the additional Bauer declaration were sustained. The trial court also noted in the judgment, "In examining the [additional] Bauer Declaration, the Court has taken into account that it has been submitted in opposition to [the] motion for summary judgment/adjudication. In this case, the Court has liberally construed the [additional] Bauer Declaration in order to resolve any evidentiary doubts or ambiguities in favor of Howard . . . ." The trial court granted the motion for summary judgment in favor of Kudrow and entered judgment for her.

Upon denying Howard's motion for new trial, the trial court stated as follows: "The Bauer declaration does not set forth facts that show Bauer has knowledge of, or was familiar with, or was involved in any transaction in which post-termination commissions was [*sic*] paid to personal managers. Thus, the Bauer declaration is not competent evidence of industry custom and practice regarding post-termination compensation (either in 1991 or anytime thereafter). [¶] . . . [¶] [Howard] contend[s] that 'Mr. Bauer testified that he was aware of and involved in transactions in which post-termination commissions were paid to personal managers, including himself.' [Citation.] The Bauer declaration, however, does not identify any specific transaction in which a manager was fired and continued to receive compensation. Although the declaration vaguely refers to Mike Myers firing his manager, Bauer does not state when Myers entered into an agreement with such manager, when such agreement terminated, and the specifics of the contract as to why Myers' ex-manager continued to receive compensation after he was fired. . . . [¶] . . . Th[e] general statement regarding Bauer's knowledge that various unidentified managers have received post-termination compensation does not show that it was industry custom and practice in 1991 for managers to receive post-termination compensation. . . . [¶] [Howard] contend[s] that Mr. Bauer's testimony regarding the custom and practice is supported by his statement that his discussions with entertainment lawyers have confirmed the practice. [Citation.] The cited portion of Mr. Bauer's declaration is deficient. [¶] . . . [¶] . . . [It] does not provide a sufficient factual foundation for Mr. Bauer's opinion. Bauer does not identify an individual lawyer with whom he spoke or when such discussions occurred. Furthermore, Bauer does not state that the entertainment lawyers have informed him of several transactions in which terminated managers continued to receive compensation after termination. [¶] Finally, [Howard] contend[s] that Mr. Bauer's personal experience as a manager supports his receiving post-termination compensation. Bauer does not identify any specific transaction in which he was fired and continued to

receive compensation. . . . [¶] . . . Bauer does not identify any clients who have fired him or for what projects he continued to receive compensation after termination. [¶] Since the Bauer declaration does not set forth facts that show Bauer has knowledge of, or was familiar with, or was involved in any transaction in which post-termination commissions was [*sic*] paid to personal managers, the Bauer declaration is not competent evidence of industry custom and practice regarding termination (either in 1991 or anytime thereafter). Accordingly, the court did not err in sustaining [Kudrow's] objections to the Bauer declaration. [¶] Since it was not error to sustain [Kudrow's] objections . . . , it is unnecessary for the court to consider [Howard's] argument that the court erred in not considering evidence of custom and practice in 2000, 2004, and 2007."

Howard filed a timely notice of appeal from the judgment "and all orders appealable thereby."[8]

## DISCUSSION

### A. *Standard of Review*

"We review the grant of summary judgment de novo. (*Szadolci v. Hollywood Park Operating Co.* (1993) 14 Cal.App.4th 16, 19 [17 Cal.Rptr.2d 356].) We make 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].) A defendant moving for summary judgment meets its burden of showing that there is no merit to a cause of action by showing that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has made such a showing, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or as to a defense to the cause of action. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849, 853 [107 Cal.Rptr.2d 841, 24 P.3d 493].)" (*Moser v. Ratinoff* (2003) 105 Cal.App.4th 1211, 1216–1217 [130 Cal.Rptr.2d 198].)

"In performing our de novo review, we view the evidence in the light most favorable to plaintiffs as the losing parties. [Citation.] In this case, we

---

[8] The order denying Howard's motion for new trial is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18 [23 Cal.Rptr.3d 490, 104 P.3d 844].)

liberally construe plaintiffs' evidentiary submissions and strictly scrutinize defendants' own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiffs' favor." (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

Prior to *Reid v. Google, Inc.* (2010) 50 Cal.4th 512 [113 Cal.Rptr.3d 327, 235 P.3d 988], in which the Supreme Court expressly left open the question of whether a de novo standard or an abuse of discretion standard applies to evidentiary rulings in connection with summary judgment motions (*id.* at p. 535), case law provided that the trial court's evidentiary rulings made on summary judgment are reviewed for abuse of discretion. (See *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169 [121 Cal.Rptr.2d 79].) Although it may be arguable that evidentiary rulings at a summary judgment proceeding, such as lack of foundation, should be reviewed de novo, under any applicable standard of review, we conclude that the trial court erred in excluding the evidence of custom and usage.

### B. *Applicable Evidentiary Principles*

■ Howard opposed Kudrow's motion by submitting the additional Bauer declaration to show an entertainment industry custom and usage that Howard contends supports his claim for posttermination compensation under the parties' oral agreement. "Usage or custom[9] may be looked to, both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 755, p. 846.) Custom and usage in the entertainment industry therefore may become part of the oral agreement between the parties to explain whether Howard was entitled to receive posttermination compensation.

■ Expert testimony is admissible to prove custom and usage in an industry. (*Ecco-Phoenix Electric Corp. v. Howard J. White, Inc.* (1969) 1 Cal.3d 266, 271 [81 Cal.Rptr. 849, 461 P.2d 33]; *PM Group, Inc. v. Stewart, supra*, 154 Cal.App.4th at p. 63.) But such testimony is subject to foundational challenges. For example, the lack of foundation of an expert's testimony can be as to the expert being qualified, the validity of the principles or techniques upon which the expert relied, or as to the reliability and relevance of the facts upon which the expert relied. (See Park, Trial Objections Handbook (2d ed. 2012) § 8:29, p. 8-77.)

---

[9] Case law and commentators have used various terms to refer to the concept of custom and usage: "usage," "usage or custom" (see 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 755, p. 846; Civ. Code, § 1655), "usage of trade" (Rest.2d Contracts, § 222), "trade usage" (*Ermolieff v. R.K.O. Radio Pictures* (1942) 19 Cal.2d 543, 550 [122 P.2d 3]), "customs and practices" (*PM Group, Inc. v. Stewart* (2007) 154 Cal.App.4th 55, 63 [64 Cal.Rptr.3d 227]), or other variations of the phrase.

Evidence Code section 720, subdivision (a) provides, "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." "[T]he qualifications of an expert must be related to the particular subject upon which he is giving expert testimony." (*People v. Hogan* (1982) 31 Cal.3d 815, 852 [183 Cal.Rptr. 817, 647 P.2d 93], disapproved on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836 [281 Cal.Rptr. 90, 809 P.2d 865].) Consequently, "the field of expertise must be carefully distinguished and limited" (*People v. Brown* (2001) 96 Cal.App.4th Supp. 1, 37 [117 Cal.Rptr.2d 738]), and "[q]ualifications on related subject matter are insufficient" (*People v. Hogan, supra*, 31 Cal.3d at p. 852).

■ The foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion. (See *People v. Chavez* (1985) 39 Cal.3d 823, 828–829 [218 Cal.Rptr. 49, 705 P.2d 372]; 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2012) Competency, Examination, and Credibility of Witnesses, §§ 30.16, 30.21, pp. 668, 670.) "Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications." (*People v. Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].) "[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 219 [6 Cal.Rptr.2d 900].)

■ An expert may rely upon hearsay and other inadmissible matter in forming an opinion. (Evid. Code, § 801, subd. (b).) But that matter relied upon must "provide a reasonable basis for the particular opinion offered." (*Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34].) An expert opinion may not be based on conjectural or speculative matters. (See *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524 [3 Cal.Rptr.2d 833].) Whether the material used by an expert "is of a type on which an expert reasonably may rely . . . the factors of *necessity* and relative *reliability* [should] be given strong consideration." (1 Jefferson, Cal. Evidence Benchbook, *supra*, § 30.49, p. 689; see *People v. Lewis* (2001) 26 Cal.4th 334, 356, fn. 4, 360 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

The trial court's ruling sustaining the objections to the additional Bauer declaration appears to be based on Howard's failure to lay a foundation as to Bauer's knowledge and the facts upon which he relied. We shall discuss both the expert's qualifications and the facts upon which he relied because, based on the trial court's determination, they appear intertwined.

## C. *Expert's Qualifications*

Bauer's declaration showed that he was qualified as an expert. Bauer has been in the entertainment industry from 1974 through the present as an executive in business affairs, talent agent, and personal manager. He has obtained employment for actors, directors, writers, and producers. He was president of a prominent talent agency. He has discussed extensively entertainment matters with persons in the entertainment business. He represented as a talent agent actors who were represented by personal managers. He was familiar with specific instances concerning the payment of personal managers after termination of their representation. He discussed the matter with attorneys at a prominent entertainment law firm. He personally was a party to agreements like the one in issue here. Under these circumstances, and in the context of opposing a motion for summary judgment, Bauer has submitted the necessary facts as to his qualifications to establish a foundation upon which to render an opinion on the subject of his testimony.

That Bauer was not a personal manager in 1991—the date of the Howard-Kudrow agreement—and cannot point to specific people he talked to then is not fatal. When, for example, an expert seeks to opine regarding the meaning of a term in an industry contract "[s]o long as the witness testifies that he or she has been a member of the industry for a certain period of time and has encountered that usage of the term on several occasions by industry members, the foundation ought to be deemed adequate. Standing alone, that experience suffices." (Imwinkelried, *The Meaning of "Appropriate Validation" in Daubert v. Merrell Dow Pharmaceuticals, Inc., Interpreted in Light of the Broader Rationalist Tradition, Not the Narrow Scientific Tradition* (2003) 30 Fla.St.U. L.Rev. 735, 752, fn. omitted.)

Moreover, Bauer stated that talent agents and personal managers are treated similarly, and he had long been a talent agent. Our Supreme Court has stated that "[t]he line dividing the functions of agents . . . and of managers . . . is often blurred and sometimes crossed." (*Marathon Entertainment, Inc. v. Blasi, supra,* 42 Cal.4th at p. 980; see Lind et al., Entertainment Law 3d, Legal Concepts and Business Practices (2011) § 8.7, fn. 7.) Bauer's experience indicates a knowledge of the way those representing talent, whether as talent agents or personal managers, are paid in the entertainment industry. Also, to the extent the custom and usage existed after 1991 regarding the compensation of personal managers, that custom and usage arguably also existed in 1991 and before.

We must view the evidence and inferences therefrom in the light most favorable to the plaintiff. (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 844–845.) Under this standard, we conclude the additional Bauer

declaration demonstrated, for purposes of opposing Kudrow's motion for summary judgment, that Bauer had the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions to establish a sufficient foundation for his qualifications to opine that it was the custom and usage during the relevant period of time to pay to personal managers posttermination commissions on engagements entered into, or services rendered, during the representation.

### D. *Facts Relied Upon*

The additional Bauer declaration also provides an adequate factual foundation for his opinion. Once qualified, an expert may give an opinion "[b]ased on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, subd. (b); see *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1371 [37 Cal.Rptr.2d 596].)

An expert may rely upon experiences and conversations he or she has had and information he or she has obtained without the necessity of providing the specifics of such experiences and conversations. As one court has said, "Expert testimony may be founded on material that is not admitted into evidence and on evidence that is ordinarily inadmissible, such as hearsay, as long as the material is reliable and of a type reasonably relied upon by experts in the particular field in forming opinions. [Citation.] Thus, a gang expert may rely on conversations with gang members, his or her personal investigations of gang-related crimes, and information obtained from colleagues and other law enforcement agencies. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1463–1464 [119 Cal.Rptr.2d 272]; see *People v. Gardeley* (1996) 14 Cal.4th 605, 620 [59 Cal.Rptr.2d 356, 927 P.2d 713] [gang expert "based [his] opinion on conversations with the defendants and with other Family Crip members, his personal investigations of hundreds of crimes committed by gang members, as well as information from his colleagues and various law enforcement agencies"].) The California Supreme Court said, "A gang expert's overall opinion is typically based on information drawn from many sources and on years of experience, which in sum may be reliable." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 949 [44 Cal.Rptr.3d 237, 135 P.3d 649].) In *People v. Hill* (2011) 191 Cal.App.4th 1104 [120 Cal.Rptr.3d 251], the court stated that a gang expert may provide opinions on "the existence, composition, culture, habits, and activities of street gangs; a defendant's membership in a gang; gang rivalries; the 'motivation for a particular crime, generally retaliation or intimidation'; and 'whether and how

a crime was committed to benefit or promote a gang.' [Citation.]" (*Id.* at p. 1120.) The court added that the expert's "expertise on gang culture, habits, and expectations was adequate to permit him to opine that a gang member . . . would shoot a different member of the rival gang if the intended victim was not present . . . [and] the motivation for a gang member to shoot a police officer . . . [and] that gang rivalries effectively exclude particular gangs from certain areas of the city." (*Id.* at p. 1121.) According to the authorities, the gang expert's testimony may be based on his or her experience and general conversations without requiring specifics about transactions or people with whom the expert has conversed. As the court in *Hope v. Arrowhead & Puritas Waters, Inc.* (1959) 174 Cal.App.2d 222, 230 [344 P.2d 428], said, "In forming his opinion an expert is not confined to his own experience or facts personally known or observed by him, but may take into consideration the products of his education and study of his profession." Thus, there is no requirement that an expert set forth specific persons, conversations, or dates of such conversation for the formation of the opinion, as apparently required by the trial court here.

Bauer, in his additional declaration, augmented the original declaration by stating it had been the custom and usage in the entertainment industry from at least the early 1980's that talent agents, when their services are terminated by a client, continue to receive from the client posttermination commissions on engagements entered into, or services performed, while the agent was rendering services to that client. Bauer noted that there are certain similarities between personal managers and talent agents, and therefore "customs and practices that had arisen in the context of agency relationships were followed with respect to personal manager relationships, including the custom that commissions would be paid on the services that the clients render or engagements that the clients enter into while the agent is representing them, no matter when the income from such services or engagements is received by the client." Bauer stated that the custom and practice of posttermination compensation has existed "since at least 1991 to the present with respect to the analogous relationships between talent such as actors and personal managers." Bauer noted that Kudrow testified in her deposition "she was aware of this well known practice concerning the compensation of agents when the agent was terminated since she first started working in the entertainment industry." Bauer cannot recall anyone in the entertainment industry who ever asserted that it was not the custom and practice to pay personal managers such posttermination compensation.

Bauer further stated in his additional declaration that from 1991 to 1998, while he was president of a talent agency, when a manager was fired by the client, the manager continued to receive commissions on the income generated from contracts entered into, or services performed, while the manager was representing the client. When Bauer was a talent agent representing clients

who terminated their managers, the clients' attorneys "would usually confirm to the manager that the manager would receive his commission on monies the client received from contracts entered into, or for services rendered, while the manager was rendering services to the client." Also, when Bauer was a talent agent and then a personal manager, he had discussions with approximately seven to 10 entertainment lawyers, who all confirmed the practice of paying personal managers posttermination compensation existed from at least 1991.

Bauer also explained that after he became a personal manager in 1998, he had oral agreements with clients that were similar to the oral agreement between Howard and Kudrow in that they did not expressly state whether there was any posttermination compensation. When Bauer's clients terminated his services, he received posttermination commissions on contracts that were entered into for services that were rendered while the managerial relationship existed. This evidence of the custom and usage after the oral agreement was entered into in 1991 was consistent with, and therefore provides additional support for, his opinion that the custom and usage existed during or before 1991.

In determining that the Bauer declaration "is not competent evidence of industry custom and practice regarding post-termination compensation," the trial court focused on what it considered to be the lack of specific details in portions of the additional Bauer declaration—e.g., that "Bauer . . . does not identify any specific transaction in which a manager was fired and continued to receive compensation," the specifics of the Mike Myers transaction, the failure to identify specific individuals with whom he talked, and the failure to identify specific clients who have terminated him and continued to pay him compensation. As pointed out above, such specificity is not required for an expert opinion. With respect to the timing of Bauer's information as it relates to the agreement in issue—as referred to by the trial court—our Supreme Court has stated in a medical malpractice case, "we rejected 'an invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred.' " (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 37 [210 Cal.Rptr. 762, 694 P.2d 1134].) Those same principles should apply here. As long as the expert has sufficient experience in the industry and with the subject matter of his testimony, he or she may give an expert opinion on that subject. The additional Bauer declaration, taken as a whole, provides an adequate foundation for Bauer's opinion.[10]

---

[10] Other courts have held, based on the records before them, that there was a custom and usage in the entertainment industry for paying a personal manager posttermination commissions. (See *Columbia Artists Management, LLC v. Swenson & Burnakus, Inc.* (S.D.N.Y, Mar. 30, 2010, No. 05 Civ. 7314 (LBS)) 2010 U.S.Dist. Lexis 32879; *Columbia Artists Management, LLC v. Álvarez* (S.D.N.Y., Mar. 3, 2011, No. 08 Civ. 11254 (LBS)) 2011 U.S.Dist. Lexis 22509; see

Bauer, in his additional declaration, stated that in 1991 "only a small number of actors and actresses had talent managers . . . ,"[11] but that a custom and usage regarding mangers' compensation nonetheless existed. Kudrow contends that because managers' representation of actors was an emerging practice, there cannot be a custom and usage that binds her—that in order to do so the custom and usage must be "of such general and universal application that [s]he may be conclusively presumed to know of [it]." (*Miller v. Germain Seed & Plant Co.* (1924) 193 Cal. 62, 69 [222 P. 817].)

 There can be a custom and usage in an emerging profession, particularly here where there is an established custom and usage to pay posttermination compensation to talent agents in the entertainment industry, and Bauer declared that the usages of talent agents and personal managers are comparable. (Cal. U. Com. Code, § 1303.) Comment 4 of the Uniform Commercial Code section 1-303 provides, "A usage of trade . . . must have the 'regularity of observance' specified. The ancient English tests for 'custom' are abandoned in this connection. Therefore, it is not required that a usage of trade be 'ancient or immemorial,' 'universal,' or the like. . . . [F]ull recognition is thus available for new usages and for usages currently observed by the great majority of decent dealers, even though dissidents ready to cut corners do not agree. There is room also for proper recognition of usage agreed upon by merchants in trade codes." (U. Com. Code com. 4, reprinted at 23A pt. 1 West's Ann. Cal.U.Com. Code (2012 supp.) foll. § 1303, p. 55; see Rest.2d Contracts, § 222, com. b, p. 155.) Section 221, comment b of the Restatement Second of Contracts at page 152 provides, "The more general and well-established a usage is, the stronger is the inference that a party knew or had reason to know of it." Once it is established that a witness has adequate credentials to qualify as an expert, questions as to the degree of his or her

also *Columbia Artists Management, LLC v. Alvarez* (S.D.N.Y., Dec. 23, 2010, No. 08 Civ. 11254 (LBS)) 2010 U.S.Dist. Lexis 137154 [holding that because there was conflicting evidence whether the custom and usage existed, resolution of the issue could not be determined in a summary judgment proceeding]; 11 Haig, Business and Commercial Litigation in Federal Courts (3d ed. 2011) Entertainment, § 126:51 [recognizing that when the business relationship between the artist and the manager ends, "disputes commonly arise as to whether and to what extent a manager will continue to be compensated with respect to agreements negotiated during the 'term' of the manager," and "managers have consistently asserted—and one federal court has found, at least with respect to the opera industry—that it is the industry 'custom and practice' for the artist to pay for services rendered during the course of the managerial relationship"].) A number of cases have dealt with the right of a personal manager to obtain compensation when the personal manager had not complied with the licensing requirements for agents. (See *Marathon Entertainment, Inc. v. Blasi, supra,* 42 Cal.4th at p. 986.) Presumably, the services of the personal manager in those cases were terminated, and thus, whether he or she violated licensing requirements, would affect the right to posttermination compensation.

[11] As noted *ante* in footnote 4, personal managers existed long before 1991.

expertise go to weight not admissibility. (*People v. Bolin* (1998) 18 Cal.4th 297, 322 [75 Cal.Rptr.2d 412, 956 P.2d 374]; *People v. Brown, supra,* 96 Cal.App.4th at p. Supp. 37.)

Bauer's experience in and knowledge of the entertainment industry is adequate for him to render an opinion on specific practices, even if he was not a personal manger at the time of the agreement in issue. Our Supreme Court in the medical malpractice context has noted that medical doctors in recent years are qualified to render opinions in areas not their precise specialty. (*Mann v. Cracchiolo, supra,* 38 Cal.3d at p. 37.) "Where a witness has disclosed sufficient knowledge, the question of the degree of knowledge goes more to the weight of the evidence than its admissibility." (*Id.* at p. 38.) A "court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." (*Id.* at p. 39 [reversing summary judgment].)

■ Bauer's testimony might be discounted at trial. (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 922–923 [184 Cal.Rptr. 393] ["a party may impeach an expert witness by *contradiction*, i.e., by showing the falsity of any matter upon which the expert based his opinion. This can be done either by cross-examination of the expert or by calling other witnesses to offer evidence showing the nonexistence or error in the data upon which the first expert based his opinion"].) Any flaws in an expert's opinion may be exposed through the adversary's own evidence or in cross-examination. Those imperfections do not make the expert's sources so unreliable or speculative as to lead to rejection. So long as foundational reliability is met, the strength of an expert's assumptions affects the weight rather than the admissibility of the opinion. (See *Schreidel v. American Honda Motor Co.* (1995) 34 Cal.App.4th 1242, 1251–1253 [40 Cal.Rptr.2d 576].) "It is prejudicial error to exclude relevant and material expert evidence where a proper foundation for it has been laid, and the proffered testimony is within the proper scope of expert opinion. [Citation.]" (*Korsak v. Atlas Hotels, Inc., supra,* 2 Cal.App.4th at p. 1523.)

■ In sum, the trial court erred in this case in its findings that the Bauer declaration lacked a proper foundation because Bauer failed to demonstrate that he had participated in transactions as a personal manager similar to, and prior to, the one at issue here and because he failed to specify the persons with whom he communicated and the details of specific transactions relied upon. As noted above, such information was not required for an adequate foundation here. (*People v. Gonzalez, supra,* 38 Cal.4th at p. 949; *People v. Duran, supra,* 97 Cal.App.4th at pp. 1463–1464; *Hope v. Arrowhead & Puritas Waters, Inc., supra,* 174 Cal.App.2d at p. 230; Rest.2d Contracts, § 221, com. b, p. 152.) Accordingly, the trial court erred in excluding the additional Bauer declaration for lack of foundation. As a consequence, we do

not reach Howard's contention that the trial court should have considered whether the parties were bound by the posttermination custom and usage based on Howard's claim that it existed when the contract was modified and when it was terminated.

A plaintiff opposing a motion for summary judgment has the burden of showing that a triable issue of fact exists. (Code Civ. Proc., § 437c, subd. (p)(2).) Because the additional Bauer declaration augmenting his earlier declaration is admissible, triable issues of fact exist as to the effect of the evidence of custom and usage, including whether the custom and usage was of such "general and universal application that [Kudrow] may be conclusively presumed to know of the custom." (*Miller v. Germain Seed & Plant Co.,* *supra*, 193 Cal. at p. 69.) The trial court therefore erred in granting Kudrow's motion for summary judgment.

## DISPOSITION

The judgment is reversed. Plaintiffs are awarded their costs on appeal.

Armstrong, J., concurred.

**TURNER, P. J.,** Concurring.—I concur.

I would apply the deferential abuse of discretion standard of review to the ruling striking the declaration of Martin Bauer. Admissibility of evidence issues, even in the summary judgment context, are reviewed under the majority rule for an abuse of discretion. Every single Court of Appeal decision in the past one-half decade has applied the abuse of discretion standard of review in the summary judgment context to admissibility of evidence contentions. (*Barker v. Hennessy Industries, Inc.* (2012) 206 Cal.App.4th 140, 146–147 [141 Cal.Rptr.3d 616]; *Shugart v. Regents of University of California* (2011) 199 Cal.App.4th 499, 505 [132 Cal.Rptr.3d 72]; *Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82–83 [127 Cal.Rptr.3d 863]; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335 [115 Cal.Rptr.3d 538]; *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332 [86 Cal.Rptr.3d 274]; *Jones v. P.S. Development Co., Inc.* (2008) 166 Cal.App.4th 707, 711 [82 Cal.Rptr.3d 882], disapproved on other grounds in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7 [113 Cal.Rptr.3d 327, 235 P.3d 988]; *Great American Ins. Cos. v. Gordon Trucking, Inc.* (2008) 165 Cal.App.4th 445, 449 [81 Cal.Rptr.3d 65]; *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 467 [71 Cal.Rptr.3d 707]; *DiCola v. White Brothers Performance Products, Inc.* (2008) 158 Cal.App.4th 666, 679 [69 Cal.Rptr.3d 888]; *Barragan v. Lopez* (2007) 156 Cal.App.4th 997, 1003 [68 Cal.Rptr.3d 73]; *Landale-Cameron Court, Inc. v.*

*Ahonen* (2007) 155 Cal.App.4th 1401, 1407 [66 Cal.Rptr.3d 776]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 122 [59 Cal.Rptr.3d 618]; *Geffcken v. D'Andrea* (2006) 137 Cal.App.4th 1298, 1311 [41 Cal.Rptr.3d 80].) Our Supreme Court has not yet decided whether the abuse of discretion standard of review applies to admissibility of evidence issues in summary judgment appeals. (*Reid v. Google, supra,* 50 Cal.4th at p. 535.) But I believe in this case, that is the proper standard of review.

And the unanimous view of the Courts of Appeal makes great sense. There are a plethora of issues, other than the appeal's ultimate merits, which, in the context of summary judgment litigation, are reviewed for an abuse of discretion. (*Johnson v. Alameda County Medical Center* (2012) 205 Cal.App.4th 521, 532 [140 Cal.Rptr.3d 281] [denial of continuance request pursuant to Code Civ. Proc., § 437c, subd. (h)]; *Hall v. Goodwill Industries of Southern California* (2011) 193 Cal.App.4th 718, 730 [123 Cal.Rptr.3d 274] [new trial motion based on newly discovered evidence after summary judgment entered subject to abuse of discretion standard of review]; *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 765 [111 Cal.Rptr.3d 910] [refusal pursuant to Cal. Rules of Court, rule 3.1300(d) to consider surrebuttal papers reviewed for abuse of discretion]; *Nieto v. Blue Shield of California Life & Health Ins. Co.* (2010) 181 Cal.App.4th 60, 72 [103 Cal.Rptr.3d 906] [decision to allow a party to file a renewed or subsequent motion for summary judgment reviewed for an abuse of discretion]; *Truong v. Glasser* (2009) 181 Cal.App.4th 102, 118 [103 Cal.Rptr.3d 811] [abuse of discretion standard of review applies to trial court's refusal to deny a summary judgment motion because defendant's papers did not have the legally required headings]; *Kojababian v. Genuine Home Loans, Inc.* (2009) 174 Cal.App.4th 408, 416 [94 Cal.Rptr.3d 288] [decision to grant summary judgment because no opposition separate statement filed reviewed for abuse of discretion]; *Mills v. U.S. Bank* (2008) 166 Cal.App.4th 871, 900 [83 Cal.Rptr.3d 146] [abuse of discretion standard of review applies to trial court's decision to grant summary judgment based upon state of mind evidence of a sole witness as permitted by Code Civ. Proc., § 437c, subd. (e)]; *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, 643–645 [60 Cal.Rptr.3d 279] [trial court did not abuse its discretion in declining to read a disorganized set of exhibits and to allow the filing of an additional declaration]; *Collins v. Hertz Corp.* (2006) 144 Cal.App.4th 64, 67, 71–75 [50 Cal.Rptr.3d 149] [striking portions of a separate statement]; *Tilley v. CZ Master Assn.* (2005) 131 Cal.App.4th 464, 479 [32 Cal.Rptr.3d 151] [trial court's decision not to expressly rule on lengthy evidentiary objections]; *Centennial Ins. Co. v. United States Fire Ins. Co.* (2001) 88 Cal.App.4th 105, 111 [105 Cal.Rptr.2d 559] [in an appeal from a summary judgment order where the trial court used its equitable powers to allocate defense costs, standard of review is abuse of discretion]; *Jovine v. FHP, Inc.* (1998) 64

Cal.App.4th 1506, 1525, fn. 23 [76 Cal.Rptr.2d 322] [denial of opportunity to orally argue motion]; *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8 [13 Cal.Rptr.2d 811] [consideration of new evidence attached to the reply].) Admissibility of evidence questions, like the foregoing issues, involve trial courts making qualitative and sometimes equitable determinations. Thus, I would expressly review this issue (as many other problems arising in the summary judgment context are examined) under the deferential abuse of discretion standard of review.

Here, the trial court did not have the discretion to sustain defendants' objections to the declaration of Mr. Bauer. The uncontroverted evidence demonstrates that Mr. Bauer is a knowledgeable, experienced entertainment lawyer and manager. He has worked for the most renowned entertainment agencies in the world: International Creative Management and The William Morris Agency. He has owned his own agency. He was a senior vice-president of The William Morris Agency and has lectured to entertainment and legal audiences alike about the roles of an agent and a personal manager. He has represented the interests of leading actors. He did not have to be an agent to describe what they have done historically and currently. Our Supreme Court has made it clear that *as a matter of law*—an experienced, knowledgeable and professionally trained witness expressing an opinion need not be a practitioner in the field about which she or he expounds. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 37–40 [210 Cal.Rptr. 762, 694 P.2d 1134].) Unless our Supreme Court overrules *Mann*, it is a black letter statement of California law. Further, Mr. Bauer provided detailed analysis of custom and practice and did so in the context of depositions in this case. In my view, the exclusion of Mr. Bauer's declaration was an order beyond the allowable scope of judicial discretion. Well-established opinion testimony decisional authority arising in the context of summary judgment appeals supports this conclusion. (*Avivi v. Centro Medico Urgente Medical Center, supra*, 159 Cal.App.4th at pp. 471–472; *Powell v. Kleinman, supra*, 151 Cal.App.4th at pp. 121–130; *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607 [90 Cal.Rptr.2d 396].) Thus, I concur in the judgment.

Respondents' petition for review by the Supreme Court was denied November 14, 2012, S205647.