Filed 2/6/14  Kim v. Pacifica Chemical CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JASOON KIM et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>PACIFICA CHEMICAL, INC.,<br><br>    Defendant and Respondent. | B244692<br><br>(Los Angeles County<br>Super. Ct. No. TC025313) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lynn D. Olson, Judge.  Reversed.

Mancini & Associates, Marcus A. Mancini, Christopher M. Barnes; Benedon & Serlin, Douglas G. Benedon and Gerald M. Serlin for Plaintiffs and Appellants.

Snipper, Wainer & Markoff and Maurice Wainer for Defendant and Respondent Pacifica Chemical, Inc.

_____

A man died from burns he suffered after containers of caustic chemicals were inadvertently combined. His family sued the supplier for negligence and strict product liability, alleging that the chemical containers it delivered to the man's employer were mislabeled or inadequately labeled. The family appeals a summary judgment in favor of the supplier. They contend the trial court's exclusion of portions of their expert's declaration was error and that the expert's declaration creates triable issues of fact precluding summary judgment. We agree and will reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

This action for products liability and negligence arose out of the death of Sang Won Kim (Kim) in May 2009. Kim was employed by Lekos Dye & Finishing, Inc (Lekos) as a Chemical Manager. His job duties included conducting chemical inventories, refilling chemical containers, cleaning up chemicals and employee training. At the time of his death, Kim had more than 30 years of experience in the dye and finishing business and had worked for Lekos for five years.

In May 2009, defendant and respondent Pacifica Chemical, Inc. (PCI), supplied Lekos with caustic soda (NaOH) and hydrogen peroxide ($H_2O_2$), two caustic chemicals used in the dyeing and finishing business which, if mixed together, are combustible. According to Daniel Lee, Lekos's General Manager, it is an industry standard for chemical containers—known as "totes"—of caustic soda and hydrogen peroxide to be identified by different colored coded labels: caustic soda is identified by a blue or red diamond-shaped label; hydrogen peroxide is identified by a black diamond-shaped label.

On May 28, 2009, PCI delivered a 330-gallon moveable tote of caustic soda to Lekos's external receiving area. That tote was identical to a tote delivered the same day containing hydrogen peroxide. According to a report by Juan Jimenez, Lekos's Dye House Supervisor, prepared in the course of a subsequent investigation by the California Division of Occupational Safety and Health (commonly referred to as CalOSHA) of the incident involving Kim, the caustic soda delivered by PCI came in a tote labeled with black coded placards, rather than the usual blue or red coded label. Jimenez also reported

that the tote with caustic soda did not identify the chemical inside by name anywhere on the container, although it did contain the chemical i.d. number.

Kim was working the night shift on May 28, 2009. He began work after PCI delivered the chemical totes. At the beginning of his shift, Kim checked the container levels in the chemical measuring area, and determined the hydrogen peroxide container was about half full and required refilling. He drove a forklift to the receiving area, picked up a black-labeled tote and carried it back to the chemical measuring area.

Agustin Leyva, Kim's coworker, was working in the chemical measuring area at the time and saw Kim drive in on a forklift containing what Leyva believed was a chemical tote containing caustic soda.[1] Leyva, who was 8-to-10 feet away from Kim, saw him elevate the tote near the hydrogen peroxide container, and loudly yelled out to Kim, "Hey, Mr., no mix chemicals.'" Leyva and Kim did not speak the same language. Leyva "[didn't] know if Mr. Kim heard [him]," saw him, or understood him, as Kim did not react.

Kim mixed the caustic soda with the hydrogen peroxide causing chemicals to erupt from the hydrogen peroxide container. He was engulfed in a cloud of caustic white fumes, suffered second and third degree chemical burns over 65 percent of his body and died shortly after being taken to the hospital. Kim is survived by his wife and children, plaintiffs and appellants, Jasoon Kim, Dong Hyun Kim and Na Hyun Kim (the family).

## PROCEDURAL BACKGROUND

The family filed this wrongful death suit action in May 2011 against fictional defendant manufacturers, vendors, distributors and others, alleging causes of action for products liability and negligence. PCI was substituted by amendment in July 2011 for Doe 1. The complaint alleged, among other things, that PCI defectively labeled chemical containers, and failed to notify or protect those coming into contact with its products.

---

[1] At his deposition, Leyva testified that he was confident that he had seen a label of unknown size identifying the tote's contents as caustic soda.

In due course PCI moved for summary judgment arguing it was entitled to judgment as a matter of law because the tote containing caustic soda was "sufficiently" labeled, and it owed no duty to warn of the danger of mixing the chemicals at issue. In support of its motion, PCI submitted a declaration from its president, Maq Hussain Shaikh, opining that the tote containing the caustic soda tote "has a manufacturer's labels [sic] on all four sides and chemical i.d. label [sic] on three sides," and was "marked in a manner sufficient to draw attention of the user of the product to the chemicals in the container." Shaikh also declared that PCI's caustic soda and hydrogen peroxide totes were "identified by the names of the chemical which have been stenciled onto the different totes so as to distinguish the caustic soda tote from the hydrogen peroxide tote."

In support of its opposition to the motion for summary judgment, the family submitted a declaration from Dr. Alison Vredenburgh. Vredenburgh has a Ph.D. and a Masters degree in Industrial-Organizational Psychology, a Masters of Sciences degree in Systems Management (an applied human factors degree), a B.A. in Organizational Psychology and is a Certified Professional Ergonomist. Vredenburgh declared that she "consult[s] with business and industry in areas including product and warning design and injury prevention. [She] also serve[s] as a forensic consultant for product liability and personal injury in the areas of human factors, safety and industrial-organizational psychology."[2] Vredenburgh stated that her opinions were formed based on her review of CalOSHA's 344-page investigative report of the incident, Lee's deposition testimony, 26 pages of PCI's sales journal; and 20 digital photographs of the incident. Vredenburgh's declaration also refers to two treatises and the American National Standards Institute (ANSI) industry standards.

---

[2] Vredenburgh's curriculum vitae, intended to have been an attachment to her declaration, was omitted. The issue of Vredenburgh's qualification to testify as an expert was the only subject of discussion at the hearing on the motion. When the family's counsel explained the C.V. had been inadvertently omitted, and requested that the court accept a belated submission, the court sustained PCI's objection on the ground the filing was untimely.

4

Vredenburgh opined that PCI failed effectively to control the hazards presented by the chemical totes at issue in this case due to inadequate and improper packaging, labeling, and warnings, and that these failures led directly to and were substantial factors in causing the incident that led to Kim's death. Vredenburgh's opinions were based on her conclusion that the tote Kim needed to fill, i.e., the one containing hydrogen peroxide, "had a faded, barely discernible number identifying the chemical. Moreover the chemical label and warnings on the front of the $H_2O_2$ container were torn, . . . poorly affixed, and . . . in very small print. This container did not have the typical statements and warnings as described in the existing [ANSI] standard. . . ." Vredenburgh also declared that, the tote "containing the NaOH (Caustic Soda) had a number identifying a chemical, but it did not clearly identify the chemical by name. Nor did it have the statements and warnings as described in the existing [ANSI] standard. . . ."

Vredenburgh also observed that, according to Jimenez, PCI "regularly delivered NaOH (caustic soda) to Lekos with color coded diamond shaped placards that were blue or red in color. [PCI] regularly delivered $H_2O_2$ (Hydrogen Peroxide) to Le[]kos in containers with color coded diamond placards that were black." But, on this occasion, the tote containing caustic soda that PCI delivered had been marked with a black diamond shaped placard, and nowhere on that container was the chemical contained therein identified by name. Vredenburgh opined that, given Kim's extensive experience in the industry, he would have understood the danger involved in mixing hydrogen peroxide and caustic soda. Based on his experience working at Lekos, Kim would also expect containers of a certain type and location to remain consistent. But Kim had not been aware that the tote containing caustic soda, which closely resembled the container that held the hydrogen peroxide which he planned to fill, had been changed. It was because "this one time [PCI] shipped the caustic soda in a container that on prior experience contained hydrogen peroxide," that the chance of a foreseeable accident greatly increased.

In addition to its reply, PCI submitted evidentiary objections to Vredenburgh's declaration.[3]  The court sustained PCI's objections to certain paragraphs of Vredenburgh's declaration on the grounds that Vredenburgh lacked personal knowledge of matters on which she opined (par. 3, 7-10; Evid. Code, § 702),[4] was not qualified to testify as an expert, and her opinions were problematic because they "were based largely on amateur photographs which are no substitute for a visual examination or study" (par. 2, 6-10; §§ 720, 801).  Having excluded all substantive portions of Vredenburgh's declaration, the court found the remaining evidence insufficient to create a triable factual issue, and granted summary judgment.  This timely appeal followed.

## DISCUSSION

The family contends that the trial court erred when it excluded Vredenburgh's declaration.  They maintain that, had the Court considered the declaration, it would have found that triable factual issues precluding summary judgment based on PCI's failure to warn or properly label the chemical containers involved in the accident.  We agree.

1.    *Standard of Review*

"A court may grant a summary judgment only if there is no triable issue of material fact and the moving party is entitled to judgment in its favor as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)  A defendant moving for summary judgment must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense.  (*Id*., subd. (p)(2).)  The defendant can satisfy its burden by presenting evidence that negates an element of the cause of action or evidence that the plaintiff does not possess and cannot reasonably expect to obtain evidence needed to establish an essential element.  [Citation.]  If the defendant meets this burden, the burden shifts to the plaintiff to present evidence creating a triable issue of material fact.  (Code

---

[3] PCI's evidentiary objections were not designated for inclusion in the appellate record, which contains only the court's ruling thereon.

[4] All further statutory references are to the Evidence Code unless otherwise indicated.

Civ. Proc., § 437c, subd. (p)(2).)  [¶]  We review the trial court's ruling on a summary judgment motion de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opponent. [Citation.]"  (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 181 (*Garrett*).)

The issue here is whether the trial court erred in excluding an expert witness declaration.  Recently, in the context of a pretrial evidentiary motion, the California Supreme Court held that, "[e]xcept to the extent the trial court bases its ruling on a conclusion of law . . . , its ruling excluding . . . expert testimony [is reviewed] for abuse of discretion."  (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).)  The appropriate standard of review for summary judgment evidentiary rulings is an issue the California Supreme Court has, so far, declined to address.  (See *Reid v. Google, Inc*. (2010) 50 Cal.4th 512, 535 (*Reid*) ["Thus, we need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo."].)  The majority of California appellate courts, however, including this one, have held that summary judgment evidentiary rulings, like other evidentiary rulings, are reviewed for abuse of discretion.  (See e.g., *Garrett*, *supra*, 214 Cal.App.4th at p. 181; *Park v. First American Title Co*. (2011) 201 Cal.App.4th 1418, 1427; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 CalApp.4th 1326, 1335; *Carnes v. Superior Court* (2005) 126 Cal.App.4th 688, 694; *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169; *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 192, fn. 15.)

2.    *The trial court erred when it excluded the expert witness declaration*

PCI's evidentiary objections are not part of the appellate record.  However, based on our review of the trial court's order re:  evidentiary objections to the declaration of Alison Vredenburgh in opposition to motion for summary judgment of PCI (Order), it appears that PCI asserted a virtually identical objection to each paragraph of Vredenburgh's declaration with which it took issue, to wit:  "GROUNDS FOR

OBJECTION: Lack of foundation; . . . § 702. . . . [T]he problems with Ms. Vredenburgh's opinions which are based largely on amateur photographs which are no substitute for a visual examination or a study; . . . §§ 701, 720, 801, 802, 804, *Daubert v. Merrell Dow* [*Pharmaceuticals, Inc.*], 509 U.S. 579."[5]  The trial court implicitly overruled all but three of the grounds asserted, excluding Vredenburgh's declaration based on . . . sections 801, 702 and 720.  (See *Reid*, *supra*, 50 Cal.4th at p. 534 [if trial court fails expressly to rule on specific evidentiary objections on summary judgment motion, it is presumed those objections have been overruled].)

    *a.    Section 801*

Under section 801, if "a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:  [¶]  (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and  [¶]  (b) Based on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."  Under section 801, subdivision (b), the trial court acts as a "gatekeeper" to exclude expert testimony based on matter of a type on which an expert may not reasonably rely.  (*Sargon*, *supra*, 55 Cal.4th at p. 771.)  Courts "'must be exceedingly careful not to set the threshold to the jury room too high.'"  (*Id*. at p. 769.)  The gatekeeper must remain focused on an expert's principles and methodology, not the conclusions generated.  (*Id*. at p. 772.)  "The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion.  [Citation.]"  (*Ibid*.)

---

[5] PCI's reply to plaintiffs' response to defendants' separate statement of undisputed material facts in support of motion for summary judgment motion reveals that PCI apparently asserted additional objections (e.g., improper legal opinion, hearsay, relevance, § 1200), to Vredenburgh's declaration in addition to those identified in the Order.  The court did not expressly rule on these objections, which are presumptively overruled.  (See *Reid*, *supra*, 50 Cal.4th at p. 534.)  Although those objections would be preserved on appeal (*ibid*.), PCI has not raised them.

"The rule that a trial court must liberally construe the evidence submitted in opposition to a summary judgment motion applies in ruling on both the admissibility of expert testimony and its sufficiency to create a triable issue of fact." (*Garrett*, *supra*, 214 Cal.App.4th at p. 189; see also *Jennifer C. v. Los Angeles Unified School Dist.* (2008) 168 Cal.App.4th 1320, 1332 (*Jennifer C.*) [court must liberally construe expert declaration submitted in opposition to summary judgment]; *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 125–126 (*Powell*).) An expert's declaration is sufficient to survive summary judgment if it establishes (1) "the matters relied upon in expressing the opinion," (2) "that the opinion rests on matters of a type reasonably relied upon," and (3) "the bases for the opinion. [Citation.]" (*Sanchez v. Hillerich & Bradsby Co.* (2002) 104 Cal.App.4th 703, 718 (*Sanchez*).) It is an abuse of discretion to exclude a declaration that satisfies these requirements. (See, e.g., *Garrett*, at p. 189.)

Vredenburgh's declaration meets this test. Section 802 allows the trial court to inquire into the reasons for an expert's opinion and to exclude expert opinion testimony if it is "'based on reasons unsupported by the material on which the expert relies.' [Citation.]" (*Garrett*, *supra*, 214 Cal.App.4th at p. 186.) "'The goal of trial court gatekeeping is simply to exclude "clearly invalid and unreliable" expert opinion. [Citation.] In short, the gatekeeper's role "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." [Citation.]' [Citation.]" (*Id.* at p. 187.)

Here, Vredenburgh declared that, based on her expertise, consideration of relevant industry standards and treatises, and review of PCI's sales journals, CalOSHA's report and photographs and deposition testimony, she had formed her expert opinion that PCI "failed to effectively control the hazards present in the . . . tote at issue, in this case including the packaging, labeling and warnings," and these failures "were substantial factors in causing the incident that caused Mr. Kim's death. . . ." Vredenburgh also opined that, given the hazards associated with the use of the chemicals used in this case, "there is a fundamental human factors control strategy" that a reasonable manufacturer

9

would perform in order to limit known risk associated with its product. PCI was aware of the risks and hazards associated with its product here, but failed to employ such a strategy. Had it done so, Vredenburgh testified that, it was "clear, to a reasonable certainty, based on [her] expert opinion[]," the accident that resulted in Kim's catastrophic injury and death would have been avoided. Vredenburgh also concluded that it was PCI's regular practice to deliver caustic soda to Lekos in totes labeled with red or blue color coded diamond shaped placards, and that hydrogen peroxide was regularly delivered in totes marked by black color coded diamond shaped placards. But, on the occasion at issue, PCI delivered a tote of caustic soda with a faded, barely discernible number identifying the chemical, and which uncharacteristically was marked with a black (rather than the usual red or blue) diamond shaped placard and did not identify the chemical contained inside by name.[6] The fact that PCI delivered to Lekos caustic soda in a tote marked with a black placards of the sort PCI historically had attached only to totes containing hydrogen peroxide gives rise to a material factual issue as to whether PCI greatly increased the chance of foreseeable error. In addition, Vredenburgh opined that chemical labels and warnings on the containers were poorly affixed, in too small print and lacked statements and warnings required by industry standards. Contrary to PCI's representations, Vredenburgh's opinions as to the condition and labeling of the chemical totes were not based solely on photographs she reviewed, but also on the Lee's deposition testimony, and a lengthy investigative report prepared by CalOSHA, which itself also contained an interview report by Jimenez, who had observed that the caustic soda tote

---

[6] Shaikh declared that the caustic soda and hydrogen peroxide totes involved in the incident were returned from Lekos to PCI. He also testified that the chemical totes contain manufacturer's i.d. labels, chemical i.d. labels, and had the chemical names stenciled thereon so as to distinguish caustic soda totes from hydrogen peroxide totes. However, we cannot readily ascertain whether his testimony refers only to the totes involved in the Kim incident (which Shaikh may or may not have inspected before or after the accident), or also refers to PCI's general practices or Department of Transportation regulations with which PCI must comply.

contained a black, rather than the customary blue or red placard, and a report from the eyewitness who purportedly tried to warn Kim after having seen that the caustic soda tote was mislabeled. We find Vredenburgh's explanation sufficient to support her opinion for purposes of opposing PCI's motion.

PCI's principal argument is that Vredenburgh's opinions, which are purportedly based solely on amateur photographs, "merely assert[] that the labels were inadequate," and "are no substitute for a visual examination or study." Our review of the record reveals no basis to conclude that any photograph on which Vredenburgh relied in forming her opinions was taken by an "amateur." On the contrary, a declaration submitted by the Kim family's attorney in support of the family's opposition to the summary judgment motion, laid an adequate foundation establishing that the photographs "were produced in discovery propounded to CalOSHA regarding [its] investigation into this incident." No mere amateur, CalOSHA is the governmental agency that "shoulders primary responsibility for administering and enforcing the California Occupational Safety and Health Act of 1973 . . . , Labor Code section 6300 et seq. It does this through investigating workplaces and enforcing occupational safety and health standards. (Lab. Code, §§ 6309, 6313, 6314.)" (*Rick's Electric, Inc. v. Occupational Safety & Health Appeals Bd.* (2000) 80 Cal.App.4th 1023, 1026.)

PCI also argued Vredenburgh reviewed only unauthenticated photos of unknown quality taken after the incident of labels (some of which may have been damaged or destroyed) and chemical totes, employed no photogrammetry to determine actual size or scale, and formed her opinion without reference to the quality of CalOSHA's photographs or the conditions under which the photos were taken. These arguments may provide bases to discount Vredenburgh's opinions at trial. (See *Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 922–923 [a party may impeach an expert by, among other things, "evidence showing the nonexistence or error in the data upon which the first expert based his opinion"].) But, at the summary judgment stage, "[t]hose imperfections do not make the expert's sources so unreliable or speculative as to lead to rejection. So long as foundational reliability is met, the strength of an expert's

assumptions affects the weight rather than the admissibility of the opinion. [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1121 (*Howard*).) Further, it is clear from her declaration that Vredenburgh's opinions are not derived solely from her review of photographs. They are also based on her experience, and her review of a lengthy CalOSHA investigatory report, Lee's deposition, PCI's Sales Journal, ANSI standards, and technical treatises. Clearly, these are materials of a type Vredenburgh could reasonably rely upon in forming an expert opinion regarding the potential hazards presented. (§ 801, subd. (b); see also *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.) PCI did not contend, and the trial did not find, otherwise.

PCI also argued that Vredenburgh failed to conduct relevant industrial or statistical research, and made no effort to show how a different warning would have prevented this accident. PCI also criticized Vredenburgh's failure to identify particular ANSI industry specifications, and her failure to more precisely describe an effective labeling method. In our view, none of these criticisms indicate that Vredenburgh's conclusions are speculative, conclusory or lack a reasonable basis. To paraphrase *Garrett*, *supra*, 214 Cal.App.4th 173, "[w]hatever shortcomings . . . cross-examination may or may not reveal in [Vredenburgh's] testing methods and opinion, we believe that the absence of more specific information as to the . . . methods used and the results obtained would not provide any grounds for the trial court to conclude that there was *no* reasonable basis for [her] opinion." (*Id*. at p. 187, italics added.)

In light of the rule of liberal construction, a reasoned explanation required in an expert declaration filed in opposition to a summary judgment motion need not be as detailed or extensive as that required in expert testimony presented in support of a summary judgment motion or at trial. (*Jennifer C.*, *supra*, 168 Cal.App.4th at p. 1332; *Powell*, *supra*, 151 Cal.App.4th at pp. 128–130.) Giving Vredenburgh's declaration the liberal construction required, we conclude that the explanation provided for her opinion was sufficient and that the trial court could not properly exclude the expert testimony based on her purported reliance on digital photographs. The court failed to liberally

construe the declaration, and abused its discretion in sustaining PCI's objections to that declaration based on section 801. (See *Garrett*, *supra*, 214 Cal.App.4th at p. 189.)

    *b.      Sections 702 and 720*

Section 702, subdivision (a), states the general rule that "[s]*ubject to Section 801*, the testimony of a witness concerning a particular matter is inadmissible unless he has personal knowledge of the matter." (Italics added.) Apparently, PCI argued that Vredenburgh's testimony was inadmissible under section 702, as it was not based on personal knowledge. Vredenburgh, however, was testifying as an as an expert pursuant to section 801, subdivision (a), as to subject matter sufficiently beyond common experience, "and . . . section 702 by its terms does not apply to such testimony." (*People v. Smith* (2005) 35 Cal.4th 334, 363.)

"[S]ection 720 provides that a person may testify as an expert 'if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates,' and that '[a] witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony.'" (*People v. Jones* (2012) 54 Cal.4th 1, 57; *Garrett*, *supra*, 214 Cal.App.4th at p. 190.)

"[W]ork in a particular field is not an absolute prerequisite to qualification as an expert in that field." (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 274.) The determinative factor is whether the expert "has sufficient skill or experience in the field so that his [or her] testimony would be likely to assist the jury in the search for the truth." (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38.) The degree of expertise goes to the weight of the expert's testimony, not its admissibility. (*Howard*, *supra*, 208 Cal.App.4th at pp. 1120–1121.) "'It is true . . . that the question whether a witness qualifies as an expert is a matter addressed in the first instance to the sound discretion of the trial court. [Citation.] It is also elementary, however, that the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury.' [Citation.]" (*Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1319.)

The trial court excluded portions of Vredenburgh's declaration because her CV was omitted. Of course, the court had the discretion to refuse to consider papers the family sought to file beyond the deadline without demonstrating good cause for the late submission. (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 765.) But Vredenburgh could—and did—establish her expertise by way of her own testimony. (§ 720, subd. (b); see, *Garrett, supra*, 214 Cal.App.4th at pp. 187–189.) Vredenburgh has a Ph.D. and a Masters in Industrial Organizational Psychology, and a Masters in Systems Management, a B.A. in Organizational Psychology. She consults with business and industry in areas including product and warning design and injury prevention, and is a forensic consultant for product liability and personal injury in the areas of human factors, safety and industrial-organizational psychology. According to an offer of proof made by the Kim family's attorney at the hearing on the summary judgment motion, Vredenburgh is a cognitive scientist, with significant expertise in the subset of safety, security, and container warnings and labeling, who has been retained and has testified as an expert in the field in hundreds of cases. Vredenburgh testified that the mislabeled chemical tote delivered to Kim's employer directly led to and was a substantial factor in causing the incident that caused Kim's death because Kim did not know PCI changed the customary label so that it was identical to the hydrogen peroxide label. These are matters on which a doctor of Industrial-Organizational Psychology, and expert consultant in the area of safety warnings and hazards was undoubtedly qualified to testify.

3.     *Triable issues of fact defeat summary judgment*

The complaint alleges causes of action for strict liability and negligence based on PCI's failure adequately to warn or label the chemical containers involved in the incident that led to Kim's death.

"Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about." (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002 (*Anderson*); *Saller v. Crown Cork & Seal Co., Inc.* (2010) 187

14

Cal.App.4th 1220, 1239–1240 (*Saller*).) Strict liability does not look to the standard of care or reasonableness of a manufacturer's conduct. In a strict liability action, plaintiff need only prove that "the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. Thus, in strict liability, as opposed to negligence, the reasonableness of the defendant's failure to warn is immaterial." (*Anderson*, *supra*, 53 Cal.3d at pp. 1002–1003, fn. omitted; *Saller*, *supra*, 187 Cal.App.4th at p. 1240.)

PCI's evidence in support of its motion came almost exclusively in the form of a declaration from its president, Shaikh, whose expertise is unclear.[7] He opined that the caustic soda tote involved in the incident was "marked in a manner sufficient to draw attention of the user of the product to the chemicals in the container." PCI asserts there is no evidence of the condition of the chemical containers or labels to contradict Shaikh's testimony. Not so.

First, Shaikh's declaration does not reflect that he ever saw or inspected the particular totes of caustic soda or hydrogen peroxide involved in the incident at issue here, either before they left PCI's control or after they were returned. Nor may such an inference of personal knowledge be drawn on summary judgment. (See *Grant-Burton v. Covenant Care, Inc*. (2002) 99 Cal.App.4th 1361, 1369 ["the moving party's affidavits are strictly construed"].) In addition, after reviewing the photos, Vredenburgh concluded that the tote containing the hydrogen peroxide that Kim tried to fill, bore only a faded, barely discernible number identifying the chemical. She also opined that the chemical label and warnings on the front of the container were poorly affixed, in very small print and lacked the statements and warnings required by industry standards. While PCI may have legitimate complaints regarding the quality of the CalOSHA photographs on which

---

[7] Shaikh testified only that he was "thoroughly familiar with the operations of a dye house," having owned and operated two such businesses from 1988 to 2007.

Vredenburgh relied to form her opinion, those complaints go to the weight of her testimony, not its admissibility.  (*Howard*, *supra*, 208 Cal.App.4th at pp. 1120–1121.)

Further, it is clear that Vredenburgh's opinion regarding the condition of the totes and inadequate labeling was based, not just on her review of the photographs, but also on deposition testimony and the CalOSHA report.  Based on these materials, and contrary to Shaikh's representation and PCI's regular practice, Vredenburgh determined that, on this one occasion, PCI delivered a tote of caustic soda to Lekos with a color coded placard that was inconsistent with its usual and customary practice, with which Kim and his coworkers were readily familiar.  Also in contrast with Shaikh's representation that the name was stenciled on the container, Vredenburgh's review of eyewitness reports and other materials, concluded that the tote containing caustic soda nowhere identified the chemical by name.  Based on her expertise as a forensic business consultant in areas of product and warning design, injury prevention in areas of human factors, safety and industrial-organizational psychology, Vredenburgh concluded that, by shipping the caustic soda in an inadequately and mislabeled tote that, on prior occasions contained hydrogen peroxide, PCI increased the chance of foreseeable error and injury.

Several more points raised by PCI warrant brief discussion.  First, PCI claims it was "entitled to [j]udgment on the [claim] for [s]trict [p]roduct [l]iability because the caustic soda was clearly and properly labeled . . . ."  As support PCI offered evidence that CalOSHA cited Kim's employer, having "determined the accident was caused by Lekos' failure to give [Kim] proper training in its hazard communication program . . . ."  This evidence neither addresses nor establishes the sufficiency of  PCI's labeling.  (*Anderson*, *supra*, 53 Cal.3d at pp. 1002–1003; *Saller*, *supra*, 187 Cal.App.4th at p. 1240; cf, *Luque v. McLean* (1972) 8 Cal.3d 136, 145 ["contributory negligence does not bar recovery in a strict liability action"].)

Nor is there any support for PCI's broad assertion that a "neutral safety engineering investigation determined that no vendor of chemicals, including PCI, was a

cause of the accident." The deposition testimony of Hank Cierpich, on which PCI relies, reaches no such conclusion as to the absence of PCI's liability for causing the accident.[8]

Finally, PCI points to Kim's coworker, Leyva, who claims he tried to warn Kim he was about to mix caustic soda with hydrogen peroxide and that Kim ignored the warning. Again, this evidence does not address, let alone establish, the sufficiency of PCI's own labels or warnings. On the contrary, Leyva's statement confirms that, on the date of the accident, PCI delivered caustic soda and hydrogen peroxide in identical totes and corroborates Jimenez's statement. Further, Leyva, who does not speak the same language Kim did, said he was unsure if Kim heard or understood his warning.

For the foregoing reasons, the trial court erred in granting summary judgment.

## DISPOSITION

The judgment is reversed. Appellants are awarded their costs of appeal.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

MILLER, J.[*]

---

[8] "Q: I could be mistaken. Maybe [Kim] has a degree in chemical—chemistry or something?

"A (Cierpich): Yeah: Something. And I remember them telling me this and that's why I had this confusion set in my mind in the investigative process. I mean, how can a man with this background make such a mistake or it wasn't his mistake. Was there some other factors involved. I didn't know. That's what I was trying to find out."

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.