Filed 7/18/25  Stearns Bank Nat. Assn. v. Yellow Cross Medical Clinic CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN


| | |
|---|---|
| STEARNS BANK NATIONAL ASSOCIATION,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>YELLOW CROSS MEDICAL CLINIC, INC., et al.,<br><br>        Defendants and Appellants. | B332618<br><br>(Los Angeles County Super. Ct. No. 21STCV36699) |


APPEAL from a judgment of the Superior Court of Los Angeles County, Stephanie M. Bowick, Judge.  Reversed and remanded with directions.

Stone & Sallus, Daniel R. Sallus, Darryl A. Meigs, and Adam Carpinelli for Defendants and Appellants.

Frandzel Robins Bloom & Csato and Hal D. Goldflam for Plaintiff and Respondent.

—————————

Yellow Cross Medical Clinic, Inc. (Yellow Cross) and its president, Yong T. Lee, appeal from the judgment entered against them after the trial court granted the motion for summary judgment or, in the alternative, summary adjudication filed by Stearns Bank National Association (Stearns). Stearns sued Yellow Cross and Lee for breach of contract and breach of guaranty, respectively, after Yellow Cross defaulted on a secured loan for a medical laser, which Stearns then repossessed and sold.

Yellow Cross and Lee do not dispute they breached their obligations. Rather, they contend the trial court erred in finding Stearns's sale of the repossessed laser was commercially reasonable after the court excluded the declaration of their expert on the standards for a commercially reasonable sale of repossessed commercial equipment. We agree the court erred in finding the expert was not qualified to offer any opinions. Further, the admissible portions of the expert's declaration created a triable issue of fact whether Stearns's sale of the laser was commercially reasonable. Accordingly, we reverse the judgment and direct the court to deny summary adjudication as to Stearns's causes of action for breach of contract, breach of guaranty, and Yellow Cross's affirmative defense based on commercial reasonableness.

Yellow Cross and Lee also contend the trial court erred in granting summary adjudication against them on their affirmative defense of commercial frustration arising from their inability to use the laser for seven months as a result of government-mandated business closures during the COVID-19 pandemic.

2

The court did not err: The doctrine of commercial frustration did not excuse their performance because the expansion of Yellow Cross's medical practice by using the laser was not a common, recognized purpose of the parties' financing agreement, nor is there undisputed evidence the temporary government shutdown orders destroyed (or nearly destroyed) the value of the laser. We direct the court on remand to grant summary adjudication against Yellow Cross and Lee with respect to the affirmative defense of frustration.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Equipment Finance Agreement and Default*[1]
Yellow Cross is a medical clinic in Los Angeles that provides cosmetic skin-care services. Lee is the owner and president of Yellow Cross. In April 2019 Lee, acting on behalf of Yellow Cross, entered an equipment finance agreement (agreement) with Stearns to purchase a new 2019 Cynosure Picosure Cosmetic Laser System (laser) for the purpose of expanding Yellow Cross's skin care clinic. The agreement provided Stearns would finance $165,000 for the cost of the laser, plus taxes and shipping charges;[2] beginning in October 2019 Yellow Cross would make monthly installment payments of

---

[1]      The factual background is taken from the evidence submitted by the parties in connection with Stearns's motion for summary judgment, or in the alternative, summary adjudication. We indicate where the evidence is in dispute.

[2]      The total purchase cost of the laser was $181,496, comprising $165,000 for the laser plus $16,496 in taxes and shipping charges.

$4,015 for 60 months, until the loan and interest were paid in full.  Yellow Cross was the sole owner of the laser, which was pledged as security for the loan.  In the event of a default, including failure to make a regular payment, the agreement entitled Stearns to accelerate repayment, terminate the agreement, and repossess the laser.  Paragraph 3 provided the agreement was non-cancelable:  "You cannot cancel this [c]ontract for any reason, including, but not limited to [e]quipment failure, loss &/or damage."  Paragraph 4 set forth Stearns's disclaimer of warranties, including the following:  "We make no warranty with respect to the equipment, express or implied . . . [and] we specifically disclaim any liability for consequential damages arising out of the use or inability to use the equipment and/or this agreement."[3]  There was no force majeure provision.  Lee signed a personal guaranty he would satisfy all payment obligations under the agreement.

After Yellow Cross made two (untimely) monthly payments, in December 2019 the parties agreed to a modification of the agreement, relieving Yellow Cross from payments in December 2019 and January 2020.  Yellow Cross made payments in February, March, and April 2020, but its May payment "bounced."  Yellow Cross was forced to close its clinic for seven months beginning in March 2020 due to COVID-19-related government closure orders and restrictions on nonessential medical procedures, and it was therefore unable to make commercial use of the laser.  Effective June 4, 2020 the parties entered a "COVID-19 payment relief modification" deferring the

---

[3]    Capitalization, boldface, and italics in the documents are omitted.

4

May, June, and July 2020 payments to the end of the five-year amortization period. As part of the modification, Yellow Cross agreed to resume monthly payments in August 2020.

However, Yellow Cross's August payment also "bounced," and Yellow Cross did not make any further payments. At some point thereafter, Stearns elected to accelerate repayment, and it demanded Yellow Cross immediately pay the loan balance and Lee make payment under the guaranty. After Yellow Cross and Lee failed to do so, Stearns notified them of its election to dispose of the laser, and Yellow Cross agreed to release the laser to Stearns.

Stearns's agent collected the laser, and on December 8, 2020 Stearns notified Yellow Cross that it would sell the laser in a private sale sometime after December 18. Stearns retained Omni Capital Corporation, Asset Remarketing and Recovery Services, to conduct the sale. Omni sold the laser on or about December 28 for $25,000. Stearns received proceeds of $18,825 after Omni deducted its 23 percent commission and freight costs.

B.    *The Complaint*

On October 5, 2021 Stearns filed its verified complaint alleging two causes of action: breach of contract against Yellow Cross and breach of guaranty against Lee. The complaint attached the agreement and guaranty and alleged the facts pertaining to Yellow Cross's default and Stearns's repossession of the laser. The complaint further alleged that Stearns "disposed of the [laser] by private sale in a commercially reasonable manner." The complaint sought damages of $211,084 (comprising the outstanding balance on the loan after applying the $18,825 net proceeds from the sale of the laser); late charges

5

not less than $11,731; unpaid interest from the time of the default; costs; and contractual attorneys' fees.

Yellow Cross and Lee's verified answer admitted the allegations pertaining to the agreement and guaranty but denied the allegations regarding the repossession and sale of the laser. The answer asserted 17 affirmative defenses, including a defense of "failure to mitigate," which alleged Stearns's "alleged sale price of the [laser] for $18,825 is unreasonably below the fair market value of the [laser] at the time of its sale." The answer also asserted a defense of "frustration of purpose," alleging "[Yellow Cross and Lee's] purpose of procuring the [laser] was frustrated by and through the effects of [the] COVID-19 pandemic."

C.     *Stearns's Motion for Summary Judgment and Summary Adjudication*

On October 11, 2022 Stearns filed a motion for summary judgment, or in the alternative, for summary adjudication (motion). With respect to summary judgment, the motion sought a money judgment of $207,259[4] against Yellow Cross and Lee, jointly and severally. Stearns submitted five issues for summary

---

[4]     The motion asserted $207,259 comprised the total receivable balance on the loan after applying the $18,825 received from Omni ($206,109), plus a fee paid to the agent who repossessed the laser ($1,150). Although the complaint alleged the receivable balance was $211,083, for purposes of the motion Stearns stated it was not seeking late fees, default interest, and additional finance charges, although it reserved its right to claim those amounts at trial. Yellow Cross and Lee do not dispute the dollar amount owed other than the amount credited for the sale of the repossessed laser on the basis the sale was not commercially reasonable.

6

adjudication: (1) judgment against Yellow Cross on the first cause of action for breach of contract in the amount of $207,259; (2) judgment against Lee on the second cause of action for breach of guaranty in the amount of $207,259; (3) adjudication in favor of Stearns "to the extent any claimed defense is based on an argument that any late charges . . . are unenforceable"; (4) adjudication as to any defense "based on the argument that defendants' obligations [were] excused due to the COVID pandemic"; and (5) adjudication as to any defense "based on an argument that the sale price of the [laser] was unreasonably low . . . because the sale was [not] conducted in a commercially reasonable manner."

Stearns argued in its motion that the sale of the laser for $25,000 was commercially reasonable under the standards for disposition of loan security after a default as set forth in section 9627 of the Commercial Code.[5] Stearns principally relied on the declaration of Michele Whitehouse, a repossession specialist and the Omni employee who conducted the sale of the laser. Whitehouse declared that Omni "works with banks and equipment leasing and financing companies to remarket and sell end of lease and repossessed equipment" and Omni's management had "over 25 years of experience assisting in the remarketing of equipment, including cosmetic lasers, industrial, fitness, [and] IT equipment [and] networking, phone, and

---

[5] With respect to Stearns's request for summary adjudication of any defense based on the reasonableness of late charges, Stearns stated in its motion that this was a "moot issue" because it was not seeking late fees in its motion. We therefore direct the trial court on remand to deny the motion for summary adjudication on this defense.

7

security equipment." Whitehouse had 12 years of experience working in the "equipment remarketing industry" for Omni, and she had been involved in the sale of "more than two hundred cosmetic lasers similar to the one at issue . . . "

Whitehouse declared she received the laser on December 24, 2020 after it had been repossessed. Based on her evaluation, she determined the laser "only had one wavelength, which negatively affected its resale price." Whitehouse cited other factors negatively affecting the resale price, including that "used equipment such as the [laser] is sold in the condition received, without warranty, and, based on [Whitehouse's] experience, likely needs to be recertified by the manufacturer at an estimated cost of between $35,000-$50,000." Moreover, "[d]ue to the ongoing effects of the COVID-19 pandemic, the number of potential buyers interested in the [laser] was also reduced," and "dealers in equipment like the [laser] at issue were cautious on pricing due to large amounts of inventory in their warehouses."

Upon receiving the laser, Whitehouse posted a listing on Omni's website "to solicit bids." Whitehouse explained Omni's website was the optimal forum for selling the laser: "Omni's website is visited by dealers in remarketed medical equipment worldwide, including equipment similar to the [laser] at issue, and is a place where interested buyers can and do place bids on the listed equipment. Purchasers of medical equipment of this type must be properly licensed to use it. I know from my experience that listing assets such as the [laser] on our website, which is targeted to dealers in the industry and their licensed clientele, as opposed to listing it on a more general website, such as eBay for example, produces better and quicker results in terms of properly vetted end-users and higher resale prices for our

clients. Preowned medical equipment like the [laser] is sold via private sale to accomplish these results. Based on my experience, a public sale is not practical with this type of equipment."

According to Whitehouse, Omni received four bids on the laser, for $14,500, $22,500, $23,000, and $25,000. On December 28, 2020 Omni sold the laser to the highest bidder, "a dealer in preowned medical equipment who viewed the listing on Omni's website." Omni sent the net proceeds of $18,825 to Stearns after deducting a 23% commission, a "standard" percentage in the repossession industry, plus $425 in freight costs. Whitehouse concluded based on her experience and evaluation of the resale of the laser that it was "conducted in conformity with reasonable practices among dealers in preowned and remarketed medical equipment of the type at issue here," and she believed "the Bank obtained the highest price possible for the [laser]."

In their opposition to the summary judgment motion and responsive separate statement, Yellow Cross and Lee admitted they entered the agreement and guaranty; Stearns performed its obligations; Yellow Cross and Lee defaulted and failed to pay the accelerated loan balance; and Stearns repossessed the laser. Lee submitted a declaration explaining that beginning in March 2020, "we were only able to use the [laser] sparingly, due to government closures and restrictions," and "we were forced to close our skin care clinic for approximately 7 months."[6] During

---

[6] We summarize only those portions of the Lee declaration to which Stearns did not object or as to which the trial court overruled Stearns's objections. Yellow Cross and Lee do not challenge the court's rulings sustaining Stearns's objections to

that time, the clinic "generated absolutely no income and the [laser] sat unused in the clinic for the entirety of the 7-month closure." Yellow Cross was "completely dependent upon the income generated by the skin care clinic in order to be able to make payments" for the laser, and due to the extended closure, it was "unable to make payments pursuant to the [agreement] and [was] ultimately forced to surrender the [laser] to Stearns . . . for resale." However, Yellow Cross surrendered the laser "based on [Stearns's] representation that they would re-sell it for the highest price possible." Yellow Cross "anticipated that the [laser] had a fair market value of upwards of $100,000 based on the fact we had purchased it just one year prior for a total of $181,496.25, and it was in brand new condition on account of only being used sparingly."

Yellow Cross and Lee submitted the declaration of an expert witness, Jason Koontz, to support their argument the sale of the laser was not commercially reasonable. Koontz was a former bank executive with "over 20 years of experience in lending, cash management, and consumer and commercial debt collections operations." According to his declaration, Koontz had "vast hands-on experience in bank lending practices, including managing problem loans" and "navigating foreclosures, repossessions, and efficiently managing the sale of foreclosed and repossessed equipment." Based on his knowledge, skill, training, and experience, Koontz developed "superior knowledge than the average layperson with regard to reasonable commercial practices for dealers in repossessed medical equipment."

---

other portions of Lee's declaration, and we do not consider those portions.

10

Koontz's curriculum vitae reflected that he worked as an executive at two banks between 1991 and 2012 in roles involving consumer and commercial loans, in which he "[m]anaged problem loans, including foreclosures and repossessions." Koontz worked as a consultant and served as an expert witness in depositions and at trial. His services had been engaged in more than 225 matters on numerous issues including "commercial loans" and "debt collection."

Koontz reviewed Whitehouse's declaration, the transcript of her deposition, the deposition exhibits (including her communications with the Stearns employee overseeing the disposition of the laser), and the laser manufacturer's website and marketing brochure to form an opinion "that neither [Stearns] nor [Omni] conducted the sale of the [laser] in conformity with reasonable practices for repossessed equipment." Koontz explained, "The first step in reselling a piece of repossessed equipment in a private sale is to perform independent research into the fair market value of the equipment. This is often done by a third party unrelated to the transaction." By this measure, Whitehouse did not perform an independent evaluation: "[I]nstead she spoke to 4 equipment resellers and inquired how much they would pay for the laser." Because resellers expect to profit by purchasing equipment below fair market value and reselling it at market value, it was "not commercially reasonable to assess the fair market value by inquiring what a reseller would pay for a piece of equipment." Omni could instead have used multiple resources to determine the fair market value of the laser, including "previous sales of Picosure systems on general websites such as eBay," online research into current offering prices and sales trends on general

11

websites and sites more specifically tailored to medical equipment sales, and obtaining a third-party valuation. Stearns's and Omni's failure to consult "with any independent source for determining fair market value" was not commercially reasonable.

Further, Koontz opined based on his experience that it was a reasonable commercial practice to advertise a sale of repossessed equipment "to as wide an audience as possible, whether public or private." Although Whitehouse opined it was impractical to market the laser to the public because a purchaser would need to be properly licensed to use it, Koontz observed that Whitehouse admitted in her deposition that purchasers do not need to be licensed to be eligible to purchase the laser. Thus, Omni could have offered the laser to any buyer. Further, there was no practical justification for Omni's decision not to advertise the laser to the public, and its decision "to only speak to four resellers regarding the equipment was a woefully inadequate marketing effort, and nowhere near a reasonable commercial practice for a dealer looking to obtain fair market value for repossessed medical equipment."

Koontz noted that Whitehouse had declared the laser would "likely" need to be recertified by its manufacturer at a cost between $35,000 and $50,000, negatively affecting the resale price. But, Koontz stated, Whitehouse admitted in her deposition that she did not ask the manufacturer or conduct any research into the actual recertification cost of the laser at issue, and she did not narrow her estimated range for the recertification cost. Koontz opined this "$15,000 variance in the potential cost of recertification would have a major impact on the valuation of the [laser] especially considering that it sold for only $25,000.00.

Failing to even make an inquiry into the price or need for recertification is not a reasonable practice for a reseller of medical equipment, as this information is crucial in determining the fair market value of the [laser]."[7]

Stearns filed evidentiary objections to the Koontz and Lee declarations. It objected to the entirety of the Koontz declaration as well as specific paragraphs, arguing the declaration did not contain facts sufficient to establish Koontz's qualification under Evidence Code section 720 to testify as an expert on "whether disposition of the subject [laser] . . . was made in conformity with reasonable commercial practices." In particular, although Koontz's declaration and curriculum vitae indicated he had experience in the lending industry and managed "foreclosures and repossessions," he did not have any experience in the "disposition of personal property securing commercial loans pursuant to the Uniform Commercial [C]ode, let alone any experience in the disposition of medical equipment of any type including cosmetic lasers of the type or similar to the [laser]."

In its reply, Stearns reiterated that Yellow Cross and Lee failed to submit admissible evidence of any triable issue of fact with respect to the issues submitted for summary adjudication.

---

[7] Koontz also disputed whether the laser would need to be recertified at all. Although Whitehouse's initial deposition testimony concerning recertification was ambiguous, Whitehouse ultimately testified the laser "absolutely" needed manufacturer recertification. And, as we will discuss, the trial court properly excluded Koontz's opinions that were specific to a medical laser because he had no personal knowledge or relevant expertise.

13

D.      *The Trial Court's Ruling*

After a hearing, on July 21, 2023 the trial court granted summary judgment in favor of Stearns. In its 15-page order, the court sustained Stearns's evidentiary objections to the Koontz declaration and excluded the declaration from evidence. The court found Koontz's experience in commercial loans, navigating foreclosures and repossessions, and efficiently managing the sale of foreclosed and repossessed equipment, even with extensive experience testifying as an expert witness, "are insufficient to establish, pursuant to Evidence Code section 720, that he is qualified to testify as an expert witness on the particular issue of whether or not the disposition of the Picosure Laser was done in a commercially reasonable manner and whether a fair market value for the medical laser was obtained. Mr. Koontz fails to state or show that he has experience with cosmetic lasers in the medical industry, including the pre-owned and used medical equipment market." (Citations omitted.)

The trial court explained with respect to Stearns's cause of action for breach of the agreement, that the first three elements were undisputed: existence of a contract, Stearns's performance, and Yellow Cross's breach. As to the final element of damages, Stearns submitted evidence the receivable balance on the loan and repossession costs totaled at least $207,259. Further, the Koontz declaration and cited excerpts of the Whitehouse deposition did not create a triable issue of fact that the laser was not sold in a commercially reasonable manner.

The trial court also addressed Yellow Cross's affirmative defense that its performance was excused by pandemic-related government closure orders under the doctrine of commercial frustration. The court ruled Yellow Cross failed to meet its

14

burden to demonstrate the fundamental reason the parties entered the agreement "was to enable . . . Yellow Cross to operate its business uninterrupted." To the contrary, the terms of the agreement showed "the purpose of the [l]oan [d]ocuments was for [Stearns] to lend money to . . . Yellow Cross for the purchase of the equipment, with . . . Yellow Cross agreeing to repay the loan." Moreover, the agreement did not condition Yellow Cross's payment obligations on its "cash flow from operations or ability to operate the business during the full repayment period," and Yellow Cross did not demonstrate the temporary shutdown orders totally or nearly totally destroyed its ability to make any payments toward the outstanding loan balance. Accordingly, Yellow Cross failed to create a triable issue of fact, and Stearns was entitled to summary adjudication of the defense. The court incorporated this analysis in holding Stearns was entitled to summary adjudication as to the cause of action against Lee for breach of guaranty, and, consequently, summary judgment.

On August 9, 2023 the trial court entered a judgment for Stearns and against Yellow Cross and Lee, jointly and severally, in the amount of $207,259, plus contractual attorneys' fees and costs to be determined on a postjudgment motion. Yellow Cross and Lee timely appealed.

**DISCUSSION**

A. *Standard of Review on Summary Judgment and Summary Adjudication*

A plaintiff may move for summary judgment on the ground "there is no defense to the action" or in the alternative, for summary adjudication "as to one or more causes of action within

15

an action, [or] one or more affirmative defenses" on the ground "there is no affirmative defense to the cause of action [or] there is no merit to an affirmative defense as to any cause of action." (Code Civ. Proc., § 437c, subds. (a)(1), (f)(1)). "'A motion for summary judgment or summary adjudication is properly granted only when "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."'" (*Campbell v. FPI Management, Inc.* (2024) 98 Cal.App.5th 1151, 1161 (*Campbell*); see Code Civ. Proc., § 437c, subds. (c) & (f); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

"[W]hen a plaintiff moves for summary adjudication, the plaintiff meets 'his or her burden of showing that there is no defense to a cause of action' if the plaintiff 'prove[s] each element of the cause of action entitling the party to judgment on the cause of action.'" (*Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 80; accord, *Campbell, supra*, Cal.App.5th at p. 1162; see Code Civ. Proc., § 437c, subd. (p)(1).) "When plaintiffs bear the burden of proof by a preponderance of evidence at trial, they '"must present evidence that would *require* a reasonable trier of fact to find any underlying material fact more likely than not—otherwise, [they] would not be entitled to judgment *as a matter of law*, but would have to present [their] evidence to a trier of fact."'" (*Campbell*, at p. 1162; accord, *Quidel Corp. v. Superior Court* (2020) 57 Cal.App.5th 155, 164; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 ["There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof."].) "Once the plaintiff has met that burden, the

16

burden shifts to the defendant to 'set forth the specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto.'" (*640 Octavia, LLC v. Pieper* (2023) 93 Cal.App.5th 1181, 1189, quoting Code Civ. Proc., § 437c, subd. (p)(1); accord, *Campbell*, at p. 1162 ["'If the plaintiff meets [its] burden, the defendant must set forth specific facts showing a triable issue of material facts exist[s].'"].)

We review a trial court's ruling on motion for summary judgment or summary adjudication de novo and "decide independently whether the facts not subject to triable dispute warrant judgment for the moving party or a determination a cause of action has no merit as a matter of law." (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 582; accord, *Campbell, supra*, 98 Cal.App.5th at p. 1161.) We consider "'"'"all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'"'"' (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *The Law Firm of Fox & Fox v. Chase Bank, N.A.* (2023) 95 Cal.App.5th 182, 191-192.) "'"'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party.'"'" (*Hampton*, at p. 347; accord, *Law Firm of Fox*, at p. 192; see *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 225 ["'The declarations in support of a motion for summary judgment should be strictly construed, while the opposing declarations should be liberally construed.'"].)

B.  *The Trial Court Erred in Granting Summary Judgment Because the Koontz Declaration Raised a Triable Issue of Fact Whether the Sale Was Commercially Reasonable*

   1.  *Law on secured transactions and commercial reasonableness*

The elements of a cause of action for breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821; accord, *Gordon v. Continental Casualty Co.* (2024) 107 Cal.App.5th 89, 109.) The elements of a cause of action for breach of guaranty are (1) a valid guaranty; (2) a default by the borrower; (3) and failure of the guarantor to perform under the guaranty. (*Gray1 CPB, LLC v. Kolokotronis* (2011) 202 Cal.App.4th 480, 486).[8] As discussed, in their opposition to Stearns's motion, Yellow Cross and Lee did not dispute the validity of the agreement and guaranty or that Stearns performed its obligations and Yellow Cross and Lee breached their obligations. The only disputed element is whether Stearns's damages for breach of the agreement (and Lee's obligation under the guaranty) were $207,259. Specifically, Yellow Cross and Lee contend Stearns's and Omni's disposition of the laser was not commercially reasonable under Commercial

---

[8]    In *Torrey Pines Bank v. Superior Court* (1989) 216 Cal. App.3d 813, 819 the Court of Appeal stated an additional element of breach of guaranty is notice to the guarantor of the debtor's default. It is undisputed Stearns notified Lee of Yellow Cross's default under the agreement.

18

Code section 9610,[9] and if the laser had been sold in a commercially reasonable manner, they would have been credited more than $25,000.

Section 9610 governs defaults in secured transactions.[10] Section 9610, subdivision (a), provides, "After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing." "Every aspect of a disposition of collateral, including the method, manner, time, place, and other terms, must be commercially reasonable. If commercially reasonable, a secured party may

---

[9] Further undesignated statutory references are to the Commercial Code.

[10] In 1963 the Legislature adopted the Uniform Commercial Code (UCC), with certain amendments, as the California Commercial Code. (*Goldie v. Bauchet Properties* (1975) 15 Cal.3d 307, 314; § 1101.) "Division 9 of the California Commercial Code, known as the 'Uniform Commercial Code-Secured Transactions,' includes within its scope 'any transaction (regardless of its form) which is intended to create a security interest in personal property.'" (*Gold Coast Leasing Co. v. California Carrots, Inc.* (1979) 93 Cal.App.3d 274, 278, footnote omitted.)

The agreement states in paragraph 13 that it is governed by Article 9 of the UCC and by Minnesota law. In its motion Stearns cited both provisions of the California Commercial Code and the analogous provisions in Minnesota's adoption of the UCC (Minn. Stats., § 336.1-101 et seq.). Stearns further argued "Minnesota case law and statutes . . . are in all respects similar to the California authority cited herein." On appeal, Yellow Cross and Lee cite only California authorities, and Stearns principally relies on California law. In deciding the motion, the trial court applied California law, as do we.

dispose of collateral by public or private proceedings, by one or more contracts, as a unit or in parcels, and at any time and place and on any terms." (*Id.*, subd. (b).) Section 9627, subdivision (b)(3), provides in relevant part, "A disposition of collateral is made in a commercially reasonable manner if the disposition . . . is made . . . in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition." Moreover, "[t]he fact a greater amount could have been obtained by a . . . disposition . . . at a different time or in a different method from that selected by the secured party is not of itself sufficient to preclude the secured party from establishing that the [disposition] was made in a commercially reasonable manner." (*Id.*, subd. (a).)

Section 9626, subdivision (a)(2), provides, "If the secured party's compliance is placed in issue, the secured party has the burden of establishing that the . . . disposition . . . was conducted in accordance with this chapter." "The inquiry whether a sale was commercially reasonable under [the predecessor section to section 9610, subdivision (a)(3)], . . . is intensively factual and 'the answer depends on all of the circumstances existing at the time of the sale.'" (*Ford & Vlahos v. ITT Commercial Finance Corp.* (1994) 8 Cal.4th 1220, 1235; accord, *Clark Equipment Co. v. Mastelotto, Inc.* (1978) 87 Cal.App.3d 88, 96.) If a secured party fails to prove disposition of a secured asset was commercially reasonable, "the liability of a debtor or a secondary obligor for a deficiency" is limited to the greater of the proceeds of the disposition or "[t]he amount of proceeds that would have been realized had the noncomplying secured party proceeded in

20

accordance with the provisions of this chapter . . . ." (§ 9626, subd. (a)(3).)

> 2. *The trial court erred or abused its discretion in finding Koontz was not qualified to offer any opinions on the commercial reasonableness of the sale of repossessed commercial equipment*

The only evidence Yellow Cross and Lee presented to dispute Stearns's showing the sale of the laser was commercially reasonable was Koontz's declaration, in which he opined as an expert on the sale of repossessed commercial equipment. As discussed, the trial court found the declaration failed to establish that Koontz was qualified under Evidence Code section 720 to testify "whether or not the disposition of the Picosure Laser was done in a commercially reasonable manner and whether a fair market value for the medical laser was obtained." Although we agree Koontz was not qualified to offer opinions specific to the laser or its fair market value, the court erred or abused its discretion in finding Koontz was not qualified to offer any opinions on the commercial reasonableness of the sale.[11]

---

[11] Although generally we review a trial court's rulings on evidentiary objections for an abuse of discretion, appellate courts are "'split regarding the proper standard of review for the trial court's evidentiary rulings in connection with motions for summary judgment and summary adjudication.'" (*Dix v. Live Nation Entertainment, Inc.* (2020) 56 Cal.App.5th 590, 599, fn. 2; see *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 ["[W]e need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "'[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.'" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115 (*Howard*); accord, *Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 313 (*Borrayo*) ["The focus here is whether the medical expert witness has sufficient skill or experience in the field of medical practice involved in the malpractice claim, such that his testimony will assist the jury in the search for the truth."].) ""'Where a witness

_____

novo."].) "[T]he weight of authority . . . holds that an appellate court applies an abuse of discretion standard under these circumstances. [Citations.] De novo review is proper where evidentiary objections raise questions of law, such as whether or not a statement is hearsay. [Citations.] In contrast, evidentiary objections based on lack of foundation, qualification of experts, and conclusory and speculative testimony are traditionally left to the sound discretion of the trial court." (*Alexander v. Scripps Memorial Hospital La Jolla, supra*, 23 Cal.App.5th at p. 226; see *id.* at pp. 227-228 [trial court did not abuse its discretion in sustaining defendants' objections to expert declarations submitted in opposition to summary judgment motion on bases they were conclusory and lacked foundation]; see also *Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 314 [trial court abused its discretion in excluding expert declaration submitted in opposition to summary judgment under Evid. Code, § 720].) We reach the same result regardless of whether we review the trial court's exclusion of the Koontz declaration de novo or for an abuse of discretion.

22

has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility.""" (*People v. Bolin* (1998) 18 Cal.4th 297, 322; accord, *Hernandez v. First Student, Inc.* (2019) 37 Cal.App.5th 270, 284; *Borrayo*, at p. 313.)

Koontz opined based on his experience and review of the record that the sale of the laser was not conducted "in conformity with reasonable practices for repossessed equipment." Koontz stated in his declaration that he had "special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates" (Evid. Code, § 720, subd. (a)), that is, whether the "disposition of collateral," in this case Omni posting the laser on its own website and accepting the highest of four bids, was made "in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition" (§ 9627, subd. (b)(3)). As discussed, Koontz had 20 years of experience in lending and commercial debt collection operations, including repossessions and "efficiently managing the sale of foreclosed and repossessed equipment." Although Koontz did not state he personally conducted the sale of repossessed equipment, it is a reasonable inference that as a banker with experience in debt collections and repossessed equipment, he was knowledgeable about industry procedures and standards for repossession of commercial equipment in secured transactions. (See *Howard, supra*, 208 Cal.App.4th at pp. 1116, 1121 [trial court abused its discretion in excluding expert declaration of longtime entertainment industry executive, prominent talent agent, and former personal manager on custom and practice for post-

23

termination personal manager commissions; although the expert was not a manager at the relevant time, as a talent agent he had represented actors with personal managers, was familiar with specific instances of payment of post-termination manager commissions, and was a party to agreements with manager commissions].)

The trial court found Koontz failed to establish his qualifications because the record did not show "he has experience with cosmetic lasers in the medical industry, including the pre-owned and used medical equipment market." That may have been a proper basis to sustain Stearns's objections to Koontz's opinions specific to the sale of possessed medical lasers, but not with respect to commercially reasonable practices in reselling repossessed commercial equipment generally, such as the reasonable steps necessary to value repossessed equipment. (See *Borrayo, supra*, 2 Cal.App.5th at p. 312 [trial court abused its discretion in excluding expert declaration in opposition to summary judgment on basis the expert physician was licensed in Mexico and lacked familiarity with standard of care in the United States where the moving party "fail[ed] to offer any explanation as to how the conditions or circumstances of plaintiff's treatment in California would differ from those in Mexico"].)

Although Whitehouse in her declaration set forth several factors specific to used medical lasers that would likely affect resale value (for example, the number of wavelengths and certification requirements), this goes to the weight of Koontz's testimony, not the admissibility. Nothing in Whitehouse's declaration established that the standards for valuing repossessed equipment (for example, the need for independent

24

research into the equipment's fair market value) did not apply to valuation of medical laser equipment.[12]

*Naples Restaurant, Inc. v. Coberly Ford* (1968) 259 Cal.App.2d 881 (*Naples*), relied on by Yellow Cross and Lee, is instructive. *Naples* involved a car buyer's fraud action against a dealership for selling as "new" a Ford Thunderbird that had been driven for 400 miles, damaged, and repaired. (*Id.* at p. 882.) The defendant dealer testified at trial that the subject Thunderbird was worth significantly more than the buyer paid because of high demand. (*Id.* at p. 883.) The trial court excluded the trial testimony of the buyer's expert as to the value of the Thunderbird because the expert, a car salesmen with 10 years of industry experience, sold Chryslers at the time and had never sold a Thunderbird. (*Id.* at pp. 883-884.) The Court of Appeal reversed the judgment for the dealer, holding the exclusion of the buyer's expert testimony was prejudicial error: "The specific question here is whether the trial court too narrowly defined the class of articles about which the witness could express an opinion as an expert on value. We are inclined to think the court's ruling was unnecessarily restrictive. . . . We think anyone actively engaged in the business of selling passenger automobiles is likely to have an informed opinion on the market price and value of his own and comparable makes of automobiles, that such an opinion

_____

[12]     As discussed, Whitehouse opined in her declaration that listing the laser on Omni's dealer-oriented website was preferable to listing it on a general public website because "[p]urchasers of medical equipment of this type must be properly licensed to use it." However, as Koontz pointed out in his declaration, Whitehouse admitted in her deposition there was no licensing restriction on who could *buy* a medical laser.

25

is of sufficient moment to be received in evidence.  The valuation of motor vehicles is not an arcane art like brain surgery, whose mysteries are known only to a select few, but a subject of widespread familiarity and general understanding among those engaged in the automobile business.  An active, experienced automobile salesman, when divorced from any pecuniary interest of his own, may be a reliable source of information on market price." (*Id.* at pp. 884-885.)

Like the salesman in *Naples* who had sufficient experience in the business of selling passenger automobiles to opine on the market price and value of automobiles generally, Koontz's 20 years of experience in managing the sale of repossessed commercial equipment was sufficient for him to opine on the valuation of repossessed commercial equipment generally (*Naples, supra*, 259 Cal.App.2d at pp. 884-885), such that "'his testimony would be likely to assist [the factfinder] in the search for truth.'" (*Howard, supra*, 208 Cal.App.4th at p. 1115.)

> 3. *Admissible portions of the Koontz declaration raise a triable issue of fact whether the sale of the laser was commercially reasonable.*

Although the trial court abused its discretion in excluding Koontz's entire declaration, the trial court did not abuse its discretion in sustaining Stearns's objections to opinions specifically about the sale of medical laser equipment, under Evidence Code sections 720 and 801.[13]  For example, Koontz did

---

[13]    Evidence Code section 801 provides:  "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:  [¶]  (a) [r]elated to a subject that

26

not provide a foundation for his opinion that the laser operated at three wavelengths, rather than one. Koonz relied on the manufacturers' website and marketing materials in rendering this opinion, but the brochure he relied on stated that different models provided different wavelengths, and the record does not show which model laser Yellow Cross used. And, as noted, he was not qualified to dispute that the laser would need to be recertified. Nor was he qualified to offer an opinion on the fair market value of the specific laser, and his testimony that Picosure lasers were selling on websites such as eBay for $50,000 to $100,000 had no foundation and was based on hearsay and unauthenticated documents.[14]

---

is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) [b]ased on matter . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 770 [""Exclusion of expert opinions that rest on guess, surmise or conjecture [citation] is an inherent corollary to the foundational predicate for admission of the expert testimony: will the testimony assist the trier of fact to evaluate the issues it must decide?"""].)

[14] To support his opinion that similar laser systems were selling for $50,000 to $100,000, Koontz cited an email exchange between a Stearns employee, Michael Berezni, and Whitehouse in late November 2019 (before the pandemic). Whitehouse asked Berezni if he had any materials more specifically describing the laser acquired by Stearns to help her provide him with a valuation, and Berezni responded: "Nothing that I can find so far. . . . I see some on line for just over $50k but the eBay units

However, Koontz was qualified to opine on whether the manner of sale of the laser, as described by Whitehouse, was commercially reasonable with respect to standards for the sale of repossessed commercial equipment generally, and the admissible portions of his declaration are sufficient to create a triable issue of fact. In particular, Koontz was qualified to opine that "the first step in reselling a piece of repossessed equipment in a private sale is to perform independent research into the fair market value." According to Kuntz, Omni had multiple resources for determining the value of the laser: It could have researched previous sales of such systems, current offering prices for similar systems, and current sales trends on general websites and sites focused on medical equipment, or, most appropriately, it could have engaged a third-party valuation expert. Yet Whitehouse admitted she did not perform any independent valuation prior to listing the laser for sale on the Omni website and accepting the highest of four offers received between December 24 and December 28, 2020.

Moreover, Koontz properly opined based on his experience that "equipment resellers generate profits by purchasing equipment at a price that is lower than fair market value and reselling it for fair market value," and so it was "not commercially reasonable to assess fair market value by inquiring

---

are over $100k." The emails were introduced at the Whitehouse deposition and attached to Stearns's opposition. However, the underlying internet postings are not in the record, and Koontz did not provide any foundation for what models were offered online, whether the offered prices reflected consummated transactions, or whether the information reported by Berezni was accurate with respect to the relevant timeframe.

what [a] seller would pay for a piece of equipment." Koontz was also qualified to offer an opinion based on his experience that it was a reasonable commercial practice to advertise the resale of the laser "to as wide of an audience as possible, whether public or private" and, in light of Whitehouse's admission that there was no requirement that a buyer be licensed to use the laser, "Omni . . . was at liberty to sell the equipment to any purchaser, without regard for their licensure status." These opinions in turn supported Koontz's conclusion that "Omni's decision to only speak to four resellers regarding the equipment was a woefully inadequate marketing effort, and nowhere near a reasonable commercial practice."

Finally, although Koontz was not qualified to opine on the need for recertification, he permissibly opined that Whitehouse's failure even to attempt to determine the actual cost of recertification (for example by asking the manufacturer) was unreasonable in light of her opinion that recertification costs could range anywhere between $35,000 and $50,000, particularly where the $15,000 variance was significant in evaluating the adequacy of the bids for the laser.

Although Whitehouse, who was involved in the sale of hundreds of medical lasers, was more knowledgeable than Koontz about reselling medical lasers, the weight of Koontz's testimony in light of his experience and expertise with respect to marketing repossessed equipment was a question for the factfinder. (See *Borrayo, supra*, 2 Cal.App.5th at p. 313 ["'if a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes to the weight of his testimony rather than to its admissibility.'"].) Liberally construed, the Koontz declaration identified at least one

29

disputed issue of fact as to whether the sale of the laser was commercially reasonable, precluding summary judgment or summary adjudication of that issue. (See *Lee v. Electric Motor Division* (1985) 169 Cal.App.3d 375, 381 ["'[i]f a single issue of fact is found, the trial court is powerless to proceed and must allow such issue to be tried'"].)[15]

C.  *The Trial Court Properly Granted Summary Adjudication in Favor of Stearns with Respect to the Affirmative Defense of Commercial Frustration*

Yellow Cross and Lee contend the trial court erred in ruling the doctrine of commercial frustration did not apply, and in

---

[15] Stearns raised for the first time at oral argument that Yellow Cross failed on appeal to respond to all evidentiary objections Stearns asserted with respect to Koontz's declaration, for example, that Koontz's opinions lacked foundation and Koontz improperly stated legal conclusions. However, Yellow Cross addressed in its opening brief why the trial court erred (or abused its discretion) in excluding the entire Koontz declaration on the basis he was not qualified to state the opinions he offered. This was the principal issue raised by Stearns in each of its objections, and the trial court did not specify at the summary judgment hearing or in the court's final ruling whether it sustained the individual objections on any other basis. To the extent Stearns contends Yellow Cross failed to address every basis for Stearns's objections, Stearns forfeited this contention by failing to raise it in its respondent's brief. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal is "deemed waived"]; *Sciarratta v. U.S. Bank National Assn.* (2016) 247 Cal.App.4th 552, 560, fn 6 [respondents forfeited their waiver argument by failing to raise the issue in their respondent's brief].)

30

rejecting their argument that they were excused from making payments under the agreement because the business-closure orders issued by the government during the COVID-19 pandemic prevented them from using the laser to generate income for seven months. Their contentions lack merit.

"The doctrine of frustration excuses contractual obligations where "'[p]erformance remains entirely possible, but the whole value of the performance to one of the parties at least, and the basic reason recognized as such by *both* parties, for entering into the contract has been destroyed by a supervening and unforeseen event.'"" (*SVAP III Poway Crossings, LLC v. Fitness Internat., LLC* (2023) 87 Cal.App.5th 882, 895 (*SVAP III*); accord, *Dorn v. Goetz* (1948) 85 Cal.App.2d 407, 410; see *Lloyd v. Murphy* (1944) 25 Cal.2d 48, 53 [under the doctrine of commercial frustration, "[p]erformance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration"].)

The Court of Appeal in *SVAP III* explained, in concluding a fitness's center's failure to pay rent during the COVID-19 pandemic was not excused by the government orders prohibiting operation of the fitness center, "A party seeking to escape the obligations of [a contract] under the doctrine of frustration must show: (1) the purpose of the contract that has been frustrated was contemplated by *both* parties in entering the contract; (2) the risk of the event was not reasonably foreseeable and the party claiming frustration did not assume the risk under the contract; and (3) the value of counterperformance is totally or nearly totally destroyed." (*SVAP III, supra*, 87 Cal.App.5th at p. 895; see *KB Salt Lake III, LLC v. Fitness Internat., LLC* (2023)

31

95 Cal.App.5th 1032, 1057 [defendant fitness center "did not show the COVID-19 pandemic or closure orders destroyed, even temporarily, ""'the whole value of the performance.'"'"].) "Governmental acts that merely make performance unprofitable or more difficult or expensive do not suffice to excuse a contractual obligation." (*SVAP III*, at p. 895.) "The excuse of commercial frustration . . . is a conclusion of law drawn from the facts of a given case." (*Glens Falls Indem. Co. v. Perscallo* (1950) 96 Cal.App.2d 799, 802.)

At least two of the elements of a frustration defense—interference with the parties' recognized purpose in contracting and the near total destruction of counterperformance—are not established in this case.[16] With respect to the parties' purpose in entering the agreement, Lee stated in his declaration that Yellow Cross purchased the laser "for the purpose of expanding our skin care clinic." But there is no evidence Stearns was aware of Lee's purpose, let alone that it shared that purpose when it loaned money to Yellow Cross. To the contrary, the terms of the agreement indicate Stearns's purpose was to loan money to Yellow Cross to purchase the laser in exchange for Yellow Cross's repayment with interest, with Stearns holding a security interest

---

[16] As to the second element, we assume without deciding that the state and local government stay-at-home orders and directives adopted during the COVID-19 pandemic required that Yellow Cross close its clinic for seven months and that the closure was not reasonably foreseeable at the time the parties entered into the agreement and guaranty. Stearns disputes both of these facts.

32

in the laser as collateral.[17] There is no evidence in the record that Stearns was investing in or co-venturing with Yellow Cross to expand its business, that Stearns understood the loan repayments would come out of Yellow Cross's operating revenues, or that repayment would be contingent on cash flow from Yellow Cross's operations. Instead, the agreement stipulated that Yellow Cross "cannot cancel this [c]ontract for any reason, including, but not limited to, equipment failure, loss &/or damage." The incorporated payment schedule further stated that the "[c]ustomer agrees its payment obligations to pay the entire sum of the total finance agreement payments is absolute and unconditional . . . ." In paragraph 4 of the agreement, Stearns disclaimed any warranty, express or implied, as to the laser and its merchantability or fitness for a particular purpose, and it specifically disclaimed "any liability for consequential damages arising out of the use or inability to use the equipment . . . ." Yellow Cross and Lee have not cited any authority, nor are we aware of any, for the proposition that a borrower's payment obligations under a bank loan for commercial equipment may be excused under the doctrine of frustration because the borrower is unable to use the equipment (through no fault of the lender), and therefore is unable to pay. Their position would result in a reallocation of risk in secured transactions that has no support in the law.

Yellow Cross and Lee also cannot establish that the seven-month closure of the clinic totally or nearly destroyed the value of

_____

[17] Yellow Cross and Lee did not dispute the statement in Stearns's separate statement of undisputed facts that Stearns "agreed to provide a loan to [Yellow Cross] to finance and to be secured by medical equipment . . . ."

33

Stearns's counterperformance under the agreement. Yellow Cross and Lee contend Stearns's counterperformance was the provision of the laser, and thus the relevant question is whether the commercial value of the laser was destroyed by the pandemic, frustrating Yellow Cross and Lee's performance under the agreement. Stearns responds that the pandemic could not have impaired the value of its counterperformance because its obligation under the agreement was to loan Yellow Cross $165,000 to purchase the laser, which Sterns did in April 2019—a year before the pandemic. Stearns has the better argument because, as discussed, the agreement reflects the parties' intent that Stearns loan Yellow Cross the money to purchase the laser, not that Stearns would purchase the laser and then lease it to Yellow Cross and Lee. But even assuming the relevant question is whether the pandemic impaired the laser's commercial value, the undisputed evidence does not show a total or nearly total loss of value.

Yellow Cross took possession of the laser in April 2019, and the parties agreed Yellow Cross would make 60 monthly payments over five years. Yellow Cross owned and could freely use the laser before the pandemic, and had it not defaulted, it could have continued to own and operate the laser indefinitely. The laser was not destroyed or decommissioned as a result of the pandemic or government closure orders. According to Lee's declaration, Yellow Cross was unable to use the laser for seven months, which impaired the laser's income-generating value, and as a result, Yellow Cross and Lee could not make payments under the agreement. But there was a disputed question of fact whether the laser had a substantially diminished value for the remainder of the 60-month period of the agreement. As the

34

Court of Appeal concluded in similar circumstances in *SVAP III, supra*, 87 Cal.App.5th at page 895, this is not a "'*total or nearly total destruction* of the purpose'" of the agreement. (See *id.* at pp. 895-896 ["[T]he temporary government closure of a fitness facility for a period of months when the premises have been leased for more than 19 years—and the lease term spans more than 23 years total—does not amount to the kind of complete frustration required for the doctrine to apply. . . . Frustration is not an available defense where, as here, counterperformance has been and remains valuable."].)

Yellow Cross and Lee argue the laser's commercial-use value was totally destroyed because Stearns "immediately repossessed the [laser] following the lifting of the government restrictions," unlike the cases in which the defendant lessees retained possession of the premises and asserted a defense to breach of the lease for nonpayment of rent. According to Lee's declaration, Yellow Cross was "completely dependent upon the income generated by the skin care clinic in order to be able to make payments" for the laser, and due to the extended closure, it was "unable to make payments pursuant to the [agreement] and [was] ultimately forced to surrender the [laser] to Stearns . . . for resale." But Yellow Cross and Lee acknowledged in their opposition to the summary judgment motion that they were able to reopen the skin care clinic in October 2020 (and thus use the laser), and the laser was repossessed two months later. Accordingly, at the time the laser was repossessed, the laser retained its value less any depreciation. The fact Yellow Cross did not have the ability to make further payments did not mean the commercial value of the laser at the time it was repossessed had been totally or nearly totally destroyed. Moreover, Lee did

35

not aver that he could not perform the guaranty, a default that preceded repossession.

Although we are sympathetic to the hardship and uncertainty Yellow Cross and other businesses faced due to the pandemic and resulting closure orders, the record does not support a finding that the doctrine of commercial frustration applies to excuse Yellow Cross and Lee's failure to make the required payments under the agreement.

## DISPOSITION

The judgment is reversed.  The matter is remanded with directions for the trial court to vacate its order granting the motion for summary judgment and summary adjudication and to enter a new order (1) denying summary judgment; (2) denying summary adjudication as to the causes of action for breach of contract and breach of guaranty and the affirmative defense of commercial reasonableness; and (3) granting summary adjudication in favor of Stearns as to the affirmative defense of commercial frustration.  Yellow Cross and Lee are to recover their costs on appeal.


FEUER, J.

We concur:



SEGAL, Acting P. J.              STONE, J.


36